**UNITED STATES v. ANDERSON et al.**

Nos. 6505–6538.

Circuit Court of Appeals, Seventh Circuit.

Jan. 17, 1939.

Rehearing Denied Feb. 23, 1939.

Geo. I. Haight, of Chicago, Ill., and A. M. Fitzgerald, of Springfield, Ill., for appellants.

Welly K. Hopkins, Sp. Asst. to Atty. Gen., and Marks Alexander, of Springfield, Ill., for the United States.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

On December 8, 1936, forty-one persons, including the thirty-four appellants, were indicted by a United States Grand Jury in the Southern Division of the Southern District of Illinois. There were two separate indictments against all the defendants. The first indictment, hereinafter referred to as the mail indictment, charged a conspiracy under section 37 of the Criminal Code, 18 U.S.C.A. § 88,[1] to violate section 201 of the Criminal Code, 18 U.S.C.A. § 324.[2]

The second indictment hereinafter referred to as the antitrust indictment, charged the violation of section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.[3] The first count of this indictment charged that the Progressive Miners of America were organized on or about September 2, 1932, and immediately thereafter sought to prevent the operation of all coal mines within Illinois, by miners other than Progressives, and to require all owners of Illinois mines to employ Progressives; that in order to

---

[1] "If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[2] "Whoever shall knowingly and willfully obstruct or retard the passage of the mail, or any * * * carrier, or car * * * or other conveyance * * * carrying the same, shall be fined not more than $100, or imprisoned not more than six months, or both."

[3] "Every * * * conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall * * * engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

carry out that purpose, appellants, with others, engaged in a conspiracy in restraint of trade, that is to say, they conspired to obstruct, retard, prevent, and interfere with the transportation in interstate commerce of express, passenger and freight, including coal, over four specified railroad lines; their objects, among others, being to obstruct, retard and prevent the interstate transportation of coal mined and handled by non-Progressives, and to prevent such transportation, by intimidating such operators, miners and railroad employees by damaging and destroying railroad property, equipment and personal property, thus rendering such transportation more hazardous.

Count 2 of this indictment averred the same facts with respect to foreign commerce. Both counts alleged that in carrying out the conspiracy appellants bombed and burned railway bridges, lines, trucks, trains, freight and motor cars.

The court overruled appellants' amended motions to quash, and pleas of not guilty were interposed. It denied appellants'. motion, filed nine days before trial, for leave to withdraw their pleas of not guilty in order to interpose a demurrer to the indictments. It denied appellants' motion for a bill of particulars under the mail indictment, and granted in part and denied in part a like motion addressed to the antitrust indictment. On the Government's motion the actions were consolidated for trial; appellant Gent's motion for a separate trial was denied, and appellants' motion to require the Government to elect the count of the consolidated indictments upon which it would rely was overruled, and it was not again renewed. No exceptions were saved to any of these rulings except to the court's denial of leave to withdraw pleas of not guilty in order to interpose demurrers.

The jury returned a verdict of guilty as to all appellants on all counts, and the court entered judgment in accordance with the verdict, that is to say, on each of the two counts of the antitrust indictment, there was a sentence of imprisonment for a term of one year and a fine of $5,000. On the mail indictment there was a sentence of imprisonment for a term of two years and a fine of $10,000, and the sentences were to run consecutively.

The record in the case is voluminous and it is neither practical nor necessary to excerpt it at length. There is substantial evidence to support the following preliminary facts: Prior to 1932 there exist- ed in Illinois practically but one labor union for miners, the United Mine Workers of America. The owners and operators of coal mines in the same territory were associated in what was known as the Coal Operators' Association of Illinois, for the purpose of bargaining with representatives of the United Mine Workers. On March 31, 1932, the labor contract which had theretofore existed between the two expired by its own terms, and negotiations leading to a new contract were in progress. These were of a protracted nature, due to the desire of the operators to lower the wage scale, and the reluctance of the miners to. accept a reduction. It resulted in a contract signed by the union officials, but this was afterwards rejected by a referendum vote of the workmen. Another contract was then submitted to the vote of the rank and file. The ballots of this election were stolen, and there was some evidence that the theft was carried out by parties who desired the approval of the contract. The president of the United Mine Workers and the Operators' Association, then, without referendum to the members, signed a new contract on August 10, 1932, which was practically the same as the one last submitted by referendum.

Many members of the United Mine Workers were dissatisfied with this action, and on or about September 1, 1932, severed their connection with that organization, and instituted a new coal miners union in Illinois, styled the Progressive Miners of America. With but two or three exceptions all of the appellants were members thereof; one being the district president, and several others, at different times covered by this record, holding the office of members of the executive board, which was the governing body thereof. The state headquarters of the Progressive Union were at Gillespie, a city in the mid-western portion of Illinois, about fifty miles south and a little west of Springfield.

The acts and attempted acts of violence complained of centered in and around three separated areas of the State. The Springfield area was located a little west of the central portion of the State. It comprised Christian County and the adjoining county of Sangamon, of which the State capital was the county seat, and extended northwest and northeast from Sangamon County along the lines of the Chicago and Illinois Midland Railway Company, and the Illinois Central Railroad Company. The Franklin

area was located in the southcentral part of the State, about one hundred sixty miles southeast of Springfield. It comprised Franklin County and the adjoining counties of Jefferson on the north, Perry on the west and Williamson on the south. The Saline area comprised Saline County which joined Williamson on its east, and the southeast corner of Franklin.

There were four railroads involved in this controversy. The Big Four crosses diagonally the southeast corner of Illinois, passing through the northeast and southwest corners of Saline County, including the towns of Eldorado and Harrisburg, thence on to the Ohio River. There is also a short branch line of this road in Saline County, running west and northwest from Harrisburg to Harco. It is known as the Harco branch, and serves exclusively the three Peabody mines in Saline County. The Illinois Central extends, from Chicago, southwest through Springfield to St. Louis; thence southeast through southern Illinois to Duquoin in Perry County; thence east and south through Franklin County to Eldorado in Saline County, where it joins the Big Four. Another branch of the Illinois Central runs southwesterly from Chicago in the eastern and central parts of the State through Urbana, Centralia, and Duquoin in Perry County, and thence south to the Ohio. The Burlington railroad enters Illinois west of Springfield, and runs southeast to Centralia, crossing the St. Louis branch of the Illinois Central a few miles east of Gillespie; thence running in a southerly direction across the counties of Jefferson, Franklin, and Williamson, again crossing the Illinois Central in Franklin County between Duquoin and Eldorado. The Chicago and Illinois Midland Railway Company runs into Springfield from the northwest; from Springfield southward it operates for an approximate distance of fifteen miles over the Chicago and St. Louis division of the Illinois Central to Cimic, where the latter railroad crosses a short branch of the Chicago and Illinois Midland which runs east from Auburn to Taylorville, a distance of perhaps twenty or twenty-five miles.

During the time herein involved the Peabody Coal Company, an Illinois coal operator, was operating in Sangamon, Christian, Franklin, Saline and other counties where substantially all the ensuing troubles occurred. As a member of the Operators' Association, it had signed the contract of August 10, 1932, and had continued to operate under it, notwithstanding picketing and continued demands by the Progressive Miners. This contract permitted only members of the United Mine Workers Union to be employed, hence all employees who left that union and joined the Progressives became ineligible to continue employment with Peabody, unless they would re-affiliate with the United Mine Workers. The Progressive Union had like difficulties with other operators, including those operating the Bell and Zoller mines, Old Ben, C. W. and F., and the United Electric.

On August 18, 1932, after the Peabody mines had reopened under the contract of August 10, approximately 12,000 men, most of whom were Progressives, marched into Taylorville, in the vicinity of which four Peabody mines were operating, and picketed the mines and blocked the roads, stopping cars and beating the miners. As a result, these mines were closed for periods ranging from several days to several months. Continued disorders resulted in stationing National Guard troops in Taylorville in October, 1932, and these were reinforced as the situation grew more threatening. The troops were moved alternately between Taylorville and Springfield, as occasion required, during the latter part of 1932 and through the year 1933.

The Progressive Miners formed local unions in Sangamon and Christian Counties in September, 1932, but the unions in Saline County did not become Progressive until February, 1933, although organization efforts were made in the southern counties in the fall of 1932. Immediately after the formation of the Progressive locals in the northern counties in the fall of 1932, and in Saline County in the early part of 1933; its delegations were waiting upon mine operators with requests for recognition and employment, and during and following the strife at Taylorville attempts to negotiate with Peabody officials were made by Progressive members, demanding that the company recognize the Progressive Union, abrogate its contract with the United Mine Workers and enter into a new contract with the Progressives, threatening that Peabody would not operate unless with Progressive Miners. During much of this period the Peabody mines were picketed by Progressives, armed violence and shooting by the pickets occurred, and in some cases it was necessary for National Guardsmen to escort

the United Mine Workers to their work. Officers and representatives of various railroad brotherhoods were solicited by Progressives, without success, to cooperate with the Progressive cause by refusing to pull coal from Taylorville, and to conduct a sympathetic strike.

The record discloses that beginning in July, 1933, and continuing until August, 1935, a series of bombings occurred at mines in Sangamon County operated by United Mine Workers, and on railroads engaged in hauling coal from these mines and Christian County mines; and on other railroads engaged in hauling coal mined by United Mine Workers in Franklin and Williamson Counties; and also on the Harco branch of the Big Four Railroad. A total of ten separate railroad trains were dynamited and blown from the tracks in all the areas. From July 1, 1933, to August 9, 1935, inclusive, in the Springfield area, there were eleven bombings, and six attempted bombings of mines, bridges, tracks and trains; from December 28, 1934, to August 26, 1935, inclusive, in the Franklin County area, five coal trains and one mine were bombed; and in the Saline area, between October 5, 1933, and December 2, 1934, railroad tracks and two railroad bridges were bombed, and one railroad bridge was burned. On one occasion a plant of 180 sticks of powerful dynamite, set to explode by the passage of a train over it, was found just in time to flag a passenger train. Other plants were discovered which apparently had been on the tracks for some time and were unexploded because the switch had failed to close sufficiently to complete a circuit. One of these was on the main line of the Illinois Central, between Chicago and St. Louis, over which its fast passenger trains constantly operated.

As a result of these bombings and attempts to bomb, it became necessary for the Illinois Central to change the operation of its coal trains between Clinton and Cimic, where the Christian County coal is transferred, from night to day runs, the night train having been wrecked by dynamite on three separate occasions. Ninety-three per cent of the coal mined in the Peabody mines, operated by United Mine Workers, was hauled over the Midland to Cimic, and from there northward over the Midland and the Illinois Central. It was also necessary for the Midland Railroad to change the operations of its coal trains from Chris-

tian County by reason of the explosions which had occurred on that road. The speed of passenger trains was restricted, and for safety purposes a light engine was run ahead of them as far north as Havana, Illinois; numerous men were employed to guard and maintain a constant inspection of tracks and bridges, and coal trains were followed by railroad agents in automobiles on parallel highways. Coal trains on this road were likewise dynamited on three occasions. Other attempts to bomb trains were made in this area, but they were either unsuccessful, or did more or less damage to the tracks. Four other bombings and attempts to bomb, however, occurred at Peabody mines in Sangamon County, along the right of way of these two roads.

The Harco branch of the Big Four served two Peabody mines. Ninety-nine per cent of the trains on this branch were coal trains, and no trains on it carried mail. The record discloses four successful bombings on this branch.

The Illinois Central and the Burlington served the mines in the Franklin County area. The mines in Franklin and Williamson counties were operated almost exclusively by United Mine Workers. In this area, on the Illinois Central there was a successful bombing of a train loaded with coal and other merchandise, and on the Burlington there were three successful bombings of three separate empty coal trains; and a mine which the Burlington served was likewise bombed nine days before it was to reopen with United Mine Workers.

In discharging the dynamite four different methods were used. This conclusion was substantially supported by testimony and by material found at the scenes where explosions failed, and by the failure to find such materials where there were actual explosions. The first method was the simple use of a lighted fuse; the second consisted in the use of wire and batteries, so arranged that one could stand off the right of way and fire the charge at the exact time when the train was passing over the buried dynamite; a third method was an automatic hook-up, which consisted in placing a partially closed knife switch under the rail. The weight of the passing train was relied upon to bend the rail down sufficiently to cause the switch to close, and complete the circuit. This method made it unnecessary for the bombers to be at the scene at the time of the explosion. Another automatic

hook-up operated by setting "Hot Shot" batteries to the side of the right of way which were connected by wires to the railroad track. At this point of connection other wires were placed, which led a few hundred feet down the track to where the dynamite was buried beneath the rails. Two wires were laid side by side on top of the rail, and the weight of the passing train would be sufficient to crush the insulation and cause the copper strand of each to fuse with the other, thus completing the connection between the batteries and the dynamite. Obviously the bombings and attempted bombings in both the Springfield and Saline County areas, from July 1, 1933, to July 30, 1934, inclusive, made use of the first method; those in the Springfield area, from the latter part of August, 1934, to early in January, 1935, employed the second method; the subsequent bombings and attempt to bomb in the Springfield area made use of the third method; and the four railroad bombings in the Franklin County area, from December 28, 1934, to and including February 27, 1935, made use of the fourth method.

■ A recital and discussion of the evidence in this case would serve no good purpose, and would extend the limits of the opinion beyond the bounds of reasonable propriety. It is sufficient to say that a reading of the entire record is quite convincing that the existence of a conspiracy as charged in both indictments is supported by substantial evidence, and we can not disturb the finding of the jury in this respect. Whether all the appellants were parties to the conspiracy within the meaning of the law is a matter we will discuss later in this opinion. We are convinced, however, that the Progressive Union was the perpetrator and abettor of the entire program.

■ It is contended by appellants that the three areas of operations, and the times and manners of the activities in each, conclusively show that the depredations in each were unrelated to the others, hence they urge that the participants in one area were not the same as those in the other areas and can not be held accountable therefor. However, the theory of the indictments is that the operations in each area were a part of the larger conspiracy which included all, and had one common purpose, viz: to stop production of the mines by stopping the railroad transportation in each area. There was substantial evidence to support this theory, and the verdict in this respect is binding upon us. We think there was no variance between the averments of the indictments and the proof. It is quite true that all of the appellants did not actually participate in the commission of each offense in all the areas, or all of the offenses in any one area, nor did they concertedly agree that each particular offense in any one or more areas should be committed. However, each contributed a material part in carrying out the general plan of stopping production in all the areas by doing his part in his home area, or where he was assigned for that purpose. The general plan was plainly described by defendant Keck, who was secretary and treasurer of the Progressive Union from 1932 to February 1935, and president of that Union from the latter date until February 1937. His official residence was at the headquarters in Gillespie, and in early February, when asked by a member of the Franklin County Strike Committee what the policy of the organization was for striking miners, he replied that he had one of two things to do—discontinue the strike or stop production of the mines, and that he had no intention of calling the strike off. This policy was certainly consistent with what had transpired in all the areas prior to that time, and was faithfully carried out afterwards in the Springfield and Franklin County areas. The record is replete with evidence of acquaintanceship and frequent contacts of the leaders of all the districts; the furnishing of dynamite by those in charge of the Progressive headquarters at Gillespie; the finding of unexploded dynamite of the same kind, and other materials such as fuses, wire and batteries at the scenes of bombings or attempted bombings; and the pertinent testimony of witnesses as to what they saw and heard leaves no doubt in our minds that the evidence was quite substantial to support the charge of a general conspiracy as described in the indictments.

■ It is urged by appellants that there was no proof of conspiracy under the mail indictment. True, there was no proof of an express agreement between any of the appellants to interfere with the movement of the mails. However, the appellants will be presumed to have intended the natural consequences of their acts; hence when they conspired to stop all railroad transportation in the areas involved they were bound to know that as a natural consequence the mails would be greatly interfered with on those railroads which carried

mails. The Harco branch of the Big Four, carried no mails, and of course no one conspired to stop or interfere with mail on this branch. From these facts the appellants whose activities were confined to that branch insist that they could not be held guilty under the mail indictment. This conclusion is not sound. The mail indictment charged a conspiracy which the jury found upon substantial evidence included all three areas, and the evidence is quite convincing that the purpose of the conspiracy would have failed had the activities in any area not occurred. As we have shown, the conspiracy contemplated interference with the mails on the roads involved which carried mails, and there was substantial evidence that they were interfered with as a natural consequence of appellants' actions in carrying out the conspiracy. The crime charged was completed after the commission of any pertinent overt act before the conspiracy was carried out, and the evidence of its full performance was admitted merely for the purpose of further supporting the charge that the conspiracy existed. The appellants whose activities were confined to the Harco branch aided the conspiracy as charged by performing such acts in their own localities as were thought by those in authority necessary to the accomplishment of the purpose of the conspiracy. They can not, therefore, avoid liability under the mail indictment merely because there was no mail carried on the road to which their activities were confined in carrying out the conspiracy. The breadth of a conspiracy is not limited by the effective limitations of an overt act committed by one of the conspirators. If one participates in a conspiracy it is immaterial that he has committed no overt act. Tramp v. United States, 8 Cir., 86 F.2d 82.

Appellants Newman, Lowe and Stewart contend that the court erred in not directing a verdict as to them because all of their proved activities admittedly occurred more than three years prior to the return of the indictments. It was charged and proved by substantial evidence that the conspiracy was a continuing one, and the same evidence was relied upon to support both indictments. This contention is without merit under the ruling in Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614, and Boyle v. United States, 7 Cir., 259 F. 803. In the latter opinion it is said: "While the parties entering into such unlawful combination might have withdrawn from such combination and thereby have relieved themselves from further liability, and the statute of limitations would have begun to run from the time of such withdrawal, yet it required some affirmative act on the part of the conspirators to avoid the liability which their entry into the combination created." Here there was no affirmative act which in any manner indicated a withdrawal, and there was no error in denying a directed verdict for these three appellants.

It is further contended by appellants that the court erred in overruling their joint and several motions for a directed verdict as to each indictment for lack of competent evidence. These motions in effect deny the existence of substantial evidence to support either indictment. From what we have said it is obvious that this contention must fail as to the existence and purpose of a conspiracy as alleged, and we are concerned now with the question whether appellants or any of them were participants therein. What amounts to guilty participation in a conspiracy is quite fully discussed in Allen v. United States, 7 Cir., 4 F.2d 688, and Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975, and it is unnecessary to repeat the principles therein enunciated. A perusal of this record convinces us that there was substantial evidence from which the jury was warranted in concluding that each appellant was a party to, and knowingly participated in the conspiracy. Much is said by appellants about incredible witnesses and untrustworthy evidence, but counsel must know that with these questions we are not permitted to concern ourselves. There was no error in overruling the motions for directed verdicts.

Appellants further insist that the court erred in not admitting evidence of other bombings, burnings, use of firearms, and the killing of a Progressive miner, by persons other than Progressives. These incidents offered in evidence were, in the court's opinion, unconnected with the depredations charged against appellants, and he remarked that if they were able to assure the court that the incidents were thus connected he would admit the testimony, to which appellants' counsel responded that he was unable to give that assurance. Under these circumstances they were properly excluded. It is now urged for the first time by appellants that such incidents tended to

332

show provocation by others for retaliatory acts upon the part of appellants. This, if true, would not constitute a defense.

 It is further contended by appellants that the court erred in admitting as evidence Government's Exhibit 221, an article which appeared in the Progressive Miner on June 23, 1933.[4] This publication is a weekly newspaper published in Illinois for the members of the Progressive Miners organization, and purported to be the "Voice of the Rank and File of the Progressive Miners of America." It had been published regularly under the supervision of the executive officials of the Union since September 16, 1932, and the exhibit was published by the editor under the direction of the Executive Board, which consisted of seven members, two of whom, McGill and Evans, are appellants. It is quite true that the appellants who testified concerning this matter denied having authorized or read the article before its publication, or that they approved or ratified it afterwards. There is substantial evidence, however, that appellants McGill and Evans authorized the publication, as members of the Executive Board, and the evidence in this record is quite convincing that the activities of all the appellants, whenever they occurred, were quite consistent with the principles set forth in the publication. Many of these activities occurred after the publication, and as to them there can be no doubt that the exhibit was properly admitted. We are convinced that it was properly admitted against all. From the cases above referred to it seems to be well settled that knowledge on the part of individual conspirators is a matter of inference from the facts proved. It is not necessary that one be fully informed as to the scope of the conspiracy in order to justify an inference of knowledge on his part. The question is, did he join the others with a knowledge of the purposes and objects of the conspiracy. He may not know all the conspirators, yet if he knows there is a conspiracy, and has knowledge of its ob-

4 "Board Issues Statement on P. M. A. Policy.'

"Carry Out Constitution.

"Outline Should Clear Up Misunderstanding Relative to Program.

"Inasmuch as there has been some misunderstanding as to the object or policy of the Progressive Miners Union in the struggle now going on in the State of Illinois; we, your Executive Board, are mindful of the Constitution which is the law of the rank and file by which we are guided in all matters that effect our organization.

"We are told in this Constitution to wage a militant struggle for our rights against the employers which refuses to recognize the Progressive Miners of America as the only implement with which the rank and file can realize the benefits of collective bargaining in the coal areas.

"To this end we have now and will continue to carry out the policy of striking mines to stop production; and to the cost of operation by picketing in various forms suitable to the locality in which the strike is in force; use working class political policies to secure our civil rights which were jeopardized by paid political agents who jailed our members and terrorized their families; other well-known legitimate and law abiding policies incidental to the general policy such as providing food, clothing, and the necessities of life for the striking miners and families, and helping and assisting these in any strike area in working out policies for their particular needs not covered in the general policy are consistently carried into effect.

"Free Speech.

"The program or policy with reference to education and information to our membership and public at large finds a medium through the pages of the Progressive Miner, the Editor of which is under the supervision of the Executive officials. This paper so far as the Executive Board is concerned is dedicated to free expression by all of its members on constructive policies and we solicit contributions which tend to serve the best interests of the Progressive Miners of America.

"National Expansion.

"The National extension policy which is admitted by all to be necessary and is a constitutional provision of our Organization, has not been overlooked by the Board, but has been given very serious consideration. We are of the opinion that at the present time our success in all fields depends upon the centralizing of our forces in the State of Illinois. However we are and have been and will in the future carry a message to other districts to join us and are anxious and willing to assist them by whatever means we are able to employ for their liberation from Company Unionism or a similar condition of involuntary servitude."

jects, he adopts as his own the past and future acts of all the other conspirators, and this is true, unless he withdraws, even though the subsequent activities of the conspirators are extended beyond his original purpose and intent. In support of the contention that the publication was improperly admitted, appellants rely upon United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762, and analogous cases. In the Coronado Case the court held that communications from outsiders, and editorials published in the United Mine Workers Journal giving accounts of past occurrences, and representing that the troubles were due to the aggression of the armed guards of the mine owners, and that the action of the union men was justified, did not constitute such a ratification by the Board or the president as to make the International Union liable for what had been done. We think the case is not in point. There the question of admissibility of evidence was not in issue. Here there was positive substantial evidence that the Board authorized the publication.

Appellants assign as error the admission of the testimony of certain witnesses. The record does not disclose that any defendant saved an exception to any of these rulings. Counsel for appellants state that by consent of court they presented a "blanket exception" to all such rulings, although they do not refer us to that part of the record where it may be found, and we are unable to find such an order. However, we have considered each of these assignments and we are convinced that the ruling in each instance was proper.

 The court's denial of appellants' motion to set aside their pleas of not guilty and to permit them to file demurrers to the indictments was a matter largely in the discretion of the court and under the circumstances we think that discretion was not abused. The same may be said with respect to the consolidation of the cases for trial, and the denial of a separate trial to any one defendant. Each of the indictments, and each of the two counts of the antitrust indictment was based upon precisely the same facts, and we perceive no just reason why both indictments and all the defendants should not be tried at the same time and by the same jury.

 It is also contended by appellants that the court erred in the imposition of cumulative sentences, and we think this contention must prevail. There was but one conspiracy and its primary object was to stop the transportation of coal. However, as appellants are presumed to have intended the natural consequences of their acts, the objects of their conspiracy became diverse by implication, for interference with both interstate and foreign commerce, as well as the United States mails followed as a natural consequence. In Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561, Mr. Justice Holmes said that, "The conspiracy is the crime, and that is one, however diverse its objects." This related to the question whether a count was duplicitous, and it may be that it was dictum, but we think the principle is sound as applied to the facts here. This does not mean that both indictments were not properly pleaded, as a precautionary matter, but we can not believe that Congress intended to permit the accumulation of sentences upon diverse objects of a conspiracy where there was but one conspiracy and the evidence supporting each was precisely the same. The Government concedes that the precise question has not been decided by the Supreme Court, and it recognizes that many authorities support appellants' contention. We are further supported in our conclusion by prior decisions of this court. Murphy v. United States, 7 Cir., 285 F. 801; Miller v. United States, 7 Cir., 4 F.2d 228.

The judgment is affirmed as to all matters except as to the sentence of imprisonment and fines. As to these the cause is reversed with instructions to enter the sentence of imprisonment and fines in a manner not inconsistent with this opinion, that is to say the sentences of imprisonment as to each appellant should run concurrently, and the payment of one fine by any appellant shall be considered as payment of all fines assessed against such appellant, regardless of whether or not the District Court deems it proper under all the evidence to fix the fines and terms of imprisonment the same under each indictment and each count.