An order to this effect will be entered upon presentation.

**UNITED STATES of America, Plaintiff,**

v.

**PERSONAL FINANCE COMPANY, a New York corporation, Defendant.**

United States District Court
S. D. New York.
July 15, 1959.

Arthur H. Christy, U. S. Atty., by Mark F. Hughes, Jr., Asst. U. S. Atty., New York City, for plaintiff.

Gallop, Climenko & Gould, New York City, for defendant.

EDELSTEIN, District Judge.

The superseding information charges the defendant with a large number of violations of the consumer credit controls in effect during the Korean conflict, under § 601 of the Defense Production Act of 1950, 50 U.S.C.Appendix, § 2131, 50 U.S.C.A.Appendix, § 2131 and Regula-

tion W of the Board of Governors of the Federal Reserve System, effective September 18, 1950.[1] Only three groups of counts are to be moved for trial, totaling 200 alleged violations: group II charges 8 violations of § 4(a)(1) of Regulation W by as many loans to different borrowers, each in excess of the maximum loan value permitted by that section for the purpose of the loan; group III charges 155 violations of § 4(a)(2) by as many loans to different borrowers, each in excess of the maturity limitations of the section for the purpose of the loan; and group V, charging 37 violations of § 4(d) by as many loans to different borrowers without taking from each borrower the required statement. The defendant has moved to dismiss all but the first count in each group on the ground that they are duplicitous of the initial counts charged.

It is the defendant's position, on the authority of United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260, that § 601 of the Defense Production Act and the applicable provisions of Regulation W did not make a separate crime out of each of the acts charged in the 200 counts, but that they merely proscribed courses of conduct. Therefore the aggregated acts pleaded within each group constitute merely a single alleged offense, leaving the superseding information with only three valid counts, one in each group. The basis for this position is that it is possible to read the statute and the regulation so as to make the allowable unit of prosecution either a course of conduct or an individual act. In the latter reading, the defendant runs the risk of a $1,000,000 fine, $5,000 on each of 200 counts. In the former reading, the defendant is subject to possible fines amounting to $15,000 for three counts. In such a situation, before the court may choose the harsher alternative, it is necessary that Congress should have de-

---

[1]. Sections 4(a) (1) and (2) and 4(d), 15 Fed.Reg. 6118, 6931; 16 id. at 1829. The regulation was suspended on May 8, 1952, 17 Fed.Reg. 4256, and § 601 of the Defense Production Act of 1950 was repealed on June 30, 1952, 66 Stat. 305. The offenses here charged all occurred in the month of March 1951.

clared its purpose in language that is clear and definite. And it is contended that Congress has not so spoken.

The Government denies any ambiguity in the statute or regulation, pointing out the singular form of the language, referring to single individuals and single transactions. The penal section of the Defense Production Act (§ 603, 50 U.S.C.Appendix § 2133, 50 U.S.C.A.Appendix, § 2133) subjected "any person" who willfully violated "any provision" of § 601 or any regulation issued thereunder to criminal penalties. But § 601 did not proscribe any conduct. It merely authorized the issuance of regulations by the Board of Governors of the Federal Reserve System "in accordance with and to carry out the provisions of Executive Order Numbered 8843 [50 U.S.C.A.Appendix, § 2131 note] * * ". Section 2 of that Order authorized the Board to prescribe regulations concerning "any extension of instalment credit * * * ". Section 4 of Regulation W required "each instalment loan" to comply with principal amount and maturity requirement. Section 4(d) provided that "[n]o registrant" shall make "any instalment loan" without accepting in good faith a signed statement of the borrower. See also §§ 5(b), 7(i) and 8(a). But similar singular language appears in the Fair Labor Standards Act, 29 U.S.C. § 201, 29 U.S.C.A. § 201, as construed in the C.I.T. case. Section 6 requires "every employer" to pay "to each of his employees" a minimum wage; section 7 provides that "no employer" shall employ "any of his employees" who is engaged in commerce or production of goods for commerce for more than a fixed number of hours per workweek unless "such employee" receives additional compensation. Section 15(a) makes it unlawful for "any person" to violate "any" of the provisions of § 6 or § 7 or knowingly to make "any" false "statement, report, or record." Section 16(a) imposes punishment on "any person" who willfully violates "any" of the provisions of § 15. Despite such singular language

the Court held that the prohibitions related to courses of conduct rather than to the singular component acts. A clear and unambiguous purpose to make the unit of prosecution an individual act or transaction is no more definitely or unmistakably to be read from the wording of the statute and regulation here involved. What Congress has made the allowable unit of prosecution cannot be determined merely by a literal reading.

But the Government argues that in order to give the legislation a commonsensical meaning, in the light of the logic of the situation covered by statute, it must be concluded that the allowable unit of prosecution intended is the separate transaction rather than a course of conduct composed of such transactions. This logic is related to the nature of the transaction involved. The making of a loan in violation of regulatory requirements is not, it is insisted, the kind of an act that can logically be an item in a course of conduct under the "impulse" theory of Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306, adopted by the Supreme Court in the C.I.T. case. Such a transaction is characterized as essentially intermittent and discontinuous, each one constituting an entirely new bargain requiring a new decision and arising from a new and separate impulse. Different borrowers may be involved, there may be a variety of techniques to disguise violations, by different personnel of the lender at different times and at different places.

The argument is plausible and tempting, but on analysis it must be rejected. A similar argument was made to the Supreme Court in the C.I.T. case. It was there argued[2] that the Fair Labor Standards Act, in its minimum wage and overtime provisions, provided for offenses specifically limited as to each employee for each workweek. The limiting language is in the same singular form, previously compared, as the language employed in Regulation W. It was said that a decision as to each employee for each week was necessarily a

---

2. Government's brief, p. 23.

new decision not part of any continuous pattern, even if there were a general and over-all intention to violate the Act. The alleged offenses might not be repeated from week to week. An employer might pay less than the minimum, or fail to pay overtime, in one workweek and then never do so again. He might require an employee to work overtime one week during each of several months. He might require one employee to work overtime one week, and another to work overtime in some succeeding week. Different employees, new or old, might be involved. There might be at various periods different offenders among the employer's officers.

It is true that the Supreme Court did not decide the C.I.T. case merely by a rejection of the Government's argument that each alleged violation resulted from a separate impulse. Rather than analyzing the situation in terms of impulses, under In re Snow, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 and Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306, it rejected the authority of those cases as relevant because of the history and language of the legislation, and on the "solid ground" of the specific history of the legislative process that culminated in the Fair Labor Standards Act, gave it the meaning of proscribing courses of conduct. But the Court used the impulse test of the Blockburger case in defining a course of conduct, and its definition necessarily rejected the Government's contention that each violation charged stemmed from a separate impulse. It is difficult to perceive any logical distinction between the items urged as separate offenses in the C.I.T. case and here. Each may be, and has been, cogently argued to be the kind of act that is a response to a separate impulse. But logic does not require that one more than the other be considered an incompatible component of a course of conduct.

Another cogent argument for reading into the statute an intent to punish individual acts rather than courses of conduct is that the purpose of the legislation required severity rather than mildness in dealing with violators. The Defense Production Act of 1950 was emergency legislation to meet the problems posed by the Korean conflict. Executive Order No. 8843 reveals that § 601, relating to consumer credit controls, was directed toward the promotion of the national defense and the protection of the national economy. It was declared that controls were required in the public interest to facilitate the transfer of productive resources to defense industries, to assist in curbing unwarranted price advances and profiteering, to assist in restraining general inflationary tendencies and to promote the accumulation of savings available for financing the defense program, and to protect the demand for services and goods in the post-emergency period. The Government's view is that it would be inconsistent with these purposes to choose the less harsh alternative, an alternative that could only encourage wholesale violation on the ground that the same penalty would attach to it as to any lesser violation.

But the penal provisions were not the sole means of enforcement. Section 706 (50 U.S.C.Appendix § 2156, 50 U.S.C.A. Appendix, § 2156) provided for the preventive remedy of injunction and Regulation W provided for licensing and the suspension of licenses. These would appear to be most effective means of achieving the purposes of the legislation. Moreover, § 2(d) of Executive Order No. 8843 provided authority for rendering any violative loan transaction unenforceable by the person extending credit. It is perhaps to be inferred from this provision that Congress intended to authorize the most severe means of enforcement. But, as in the C.I.T. case, in connection with the individual civil remedy of each employee, the argument cuts both ways. If Congress had wanted to attach criminal consequences to each separate loan transaction, it could easily have said so, just as it had no difficulty in authorizing a regulation rendering any violative loan transaction civilly unenforceable by the lender. But most significantly, § 8(c) of Regulation W

provided that noncompliance should not affect the right to enforce contracts. It is anomalous to urge that, although a series of loan transactions in contravention of Regulation W could be enforced by the lender in a civil court, nevertheless the lender must be subjected to multiple criminal penalties for having entered into the very same series of transactions. At the very least, the position that the harsher alternative of punishment is indicated is very much weakened.

In any event, the problem of whether Congress clearly and definitely declared its purpose may more profitably be examined in the light of the statutory scheme. On the basis of the legislative history, it is difficult to ascribe a specific intent to Congress, for the debates do not seem to have considered the issue posed here. Indeed, it is difficult to ascribe any specific intent on this issue to Congress at all. For Congress merely provided, in § 603, for punishment upon conviction of any person who willfully violated § 601 or any regulation or order issued thereunder. Section 601 authorized the Board of Governors of the Federal Reserve System to exercise consumer credit controls in accordance with and to carry out the provisions of Executive Order No. 8843, and prohibited the Board from establishing certain requirements. Thus, the proscription of § 603 applied to violations of regulations which were, at the time of enactment, not yet in existence. Under the authority of § 601 the Board could perhaps have written Regulation W in such a manner as to proscribe explicitly, for penal purposes, individual acts. Or it could perhaps have written the regulation in such a manner as to proscribe explicitly, for penal purposes, courses of conduct. In view of such possibilities, it is not possible to conclude that Congress clearly and unambiguously declared its purpose that the individual act rather than the course of conduct was the proscribed offense.

If Congress had had the will to define the offense in accordance with the Government's construction, it could easily have done so. What was said in Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 622, 99 L.Ed. 905, is equally applicable here.

"It is not to be denied that argumentative skill, as was shown at the Bar, could persuasively and not unreasonably reach either of the conflicting constructions. About only one aspect of the problem can one be dogmatic. When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. * * It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. * * * "

I conclude therefore, that it is the course of conduct rather than the individual acts which must be the unit of prosecution in this case.

█ Assuming this conclusion, the Government maintains that the granting of the defendant's motion at this time would be premature. For even if a course of conduct is the unit of prosecution, it is impossible at this time to ascertain from the bare allegations of the information whether the aggregate of acts charged in each group constitutes one or more courses of conduct. See United States v. Universal C.I.T. Credit Corp., supra, 344 U.S. at page 225, 73 S.Ct. at page 231. It is argued that the evidence may establish that each loan transaction charged constituted a distinct course of conduct involving the exercise of a distinct managerial decision. This argument is merely a variant of the argument that each loan transaction is logically and necessarily a distinct and discontinuous act stemming from a separate and independent impulse. If the unit of prosecution is a course of con-

duct, the Government may not prosecute individual acts under the guise of calling them courses of conduct. In the context of this case, each separate charge may not be considered a course of conduct. Nor has there been suggested any other classification of charges into courses of conduct, a procedure which is at least conceivable.

The motion will be granted in a form to be settled upon notice, but without prejudice to an amendment of the information before trial in accordance with the theory that the unit of prosecution is a course of conduct.