**UNITED STATES of America,
Plaintiff,
v.
AMERICAN HONDA MOTOR COMPANY, Inc., et al., Defendants.**

**No. 40956.**

United States District Court
N. D. California.

Sept. 1, 1967.

Lyle L. Jones, Antitrust Division, Dept. of Justice, San Francisco, Cal., for plaintiff.

Leonard S. Lyon, Jr., Roland N. Smoot, James J. Short, Los Angeles, Cal., and the firm of Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

Defendant, American Honda Motor Company, Inc., (hereinafter Honda) a California corporation engaged in the distribution of Japanese-made Honda motorcycles throughout the United States, was indicted in this district on August 3, 1966, on a charge of violation of Section I of the Sherman Act, 15 U.S.C. § 1, by conspiring with its co-defendants, independent San Francisco Bay Area Honda dealers, to fix, maintain and stabilize retail prices of Honda motorcycles, parts and accessories "in the San Francisco Bay Area".

The case is before the Court on a motion by American Honda under Rules 12(b) (1) and 12(b) (4) Fed.R.Crim.P., to dismiss the indictment upon the grounds that it has been placed in double jeopardy and has been deprived of due process in violation of the Fifth Amendment.

The record shows that on June 10, 1966, defendant Honda was convicted for what it claims to be the same offense in the case of United States v. American Honda, in the United States District Court for the Southern District of California, Case No. 35909, in which indictment was returned March 15, 1966, and a plea of *nolo contendere* taken March 30, 1966, and a fine of $10,000 imposed on June 10, 1966.

Further, the record shows that on September 12, 1966, defendant Honda was similarly indicted for what it claims to be the same offense in the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 66 CR 574, in which the indictment is still pending on motion to dismiss upon the same grounds as urged here.

Further, the record shows that on November 22, 1966, defendant Honda was similarly indicted in the Southern District of Ohio in which case the defendants have been arraigned with the case still pending.

The record also shows that subpoenas to produce voluminous records were directed to American Honda, not only in Los Angeles (May, 1965) but also in San Francisco (March, 1966), Ohio (April and June, 1966) and in Illinois (May, 1966).

The indictment upon which American Honda was convicted in the Los Angeles case is substantially the same as the indictment in the pending San Francisco case except (1) different alleged co-conspirators in the Greater Los Angeles Area are named; (2) different dates of commencement of the conspiracy are alleged, and (3) the Los Angeles conspiracy was alleged to have been to fix, maintain and stabilize retail prices of Honda motorcycles, parts and accessories sold "in the Greater Los Angeles Area".

The Illinois and Ohio indictments are substantially similar to the Los Angeles and San Francisco indictments except: (1) different alleged co-conspirators are

named; (2) different dates of commencement are alleged, and (3) similar conspiracies for a similar purpose concerning the same products are alleged to have been "in the Chicago Area" and "in the State of Ohio", respectively.

Defendant, American Honda, contends that the indictment here (and the pending indictments in Illinois and Ohio) have placed it in double jeopardy in violation of the Fifth Amendment.

The basic question raised by this contention is whether the conspiracy charged in the pending indictment is part of a single nationwide conspiracy (for which American Honda has already been convicted and punished in the Los Angeles case and for which it stands presently indicted in the Illinois and Ohio cases) or is a separate conspiracy entered into by defendant Honda with its co-defendants herein.

Defendant Honda makes the further contention that, apart from the issue of double jeopardy, these successive prosecutions are in effect such harassment as deprives defendant of due process in violation of the Fifth Amendment—a contention which we will later and separately consider.

In support of its contentions, defendant has filed affidavits of Okumoto and McCormick (filed 10/3/66), affidavits of McCormick [2d], Cullwell, Okumoto [2d], Westcott and Short (filed 11/7/66), affidavits of Kawashian, Reeves, Roland and Short [2d] (filed 1/10/67), an affidavit of Tatum (filed 3/7/67).

In opposition the government has filed affidavits of Spivok and Duvall (filed 12/12/66).

A hearing was held on January 16th at which defendant presented brief oral testimony of two witnesses concerning certain aspects of the case. Both sides have indicated that they have no further evidence to present and the motion stands submitted.

## PROCEDURAL ASPECTS

Concerning procedural aspects of the pending motion, we note there is no special plea by which these defenses can be raised. The only pleas allowed under our procedure are "not guilty, guilty and nolo contendere". All other pleas, demurrers and motions to quash are abolished. Defenses and objections raised before trial, which heretofore could have been raised by any one or more of them, must be raised only by motion to dismiss or to grant appropriate relief as provided in the Federal Rules of Criminal Procedure. (See Rules 11–12).

Rule 12(b) provides that any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion and, further, that issues of fact on such motions shall be determined by the Court with or without a jury or on affidavits or in such other manner as the Court may direct unless jury trial is required under the Constitution or by an Act of Congress.

In Arnold v. United States, 336 F.2d 347, 351 (9th Cir. 1964), the parties had stipulated that an issue of double jeopardy be tried by the trial Court at the conclusion of a jury trial on the main issues. The Court of Appeals for this Circuit, following Short v. United States, 91 F.2d 614, 112 A.L.R. 969 (4th Cir. 1937) (decided before promulgation of the Federal Rules of Civil Procedure on December 24, 1944), stated that "where it may not be said that a plea of former jeopardy either does or does not lie as a matter of law from a comparison of the two indictments, then the issue should be submitted to the jury under appropriate instructions." The Court agreed, however, that upon trial of the issue the record of both proceedings may be referred to and findings and conclusions in conjunction with the two indictments based thereon. In that case the Court did not expressly exclude the use of other relevant evidence—such as might be supplied by affidavits as now provided by Rule 12(b). The Court of Appeals merely held that it did not appear from an analysis of the record of both proceedings that one large conspiracy had been split into two small ones

and that the Court below had not erred in finding that the offenses were not identical in law and were in fact separate in distinct conspiracies.

In United States v. Koontz, 232 F.Supp. 312, 315–321 (D.Md.1964) the Court, citing Rule 12(b), carefully reviewed the procedure concerning a pre-trial double jeopardy motion like the one here involved. Rejecting a government contention that the double jeopardy issue (unless determinable as a matter of law), must be submitted to the jury along with the general issue, the Court ordered a pre-trial evidentiary hearing without a jury at which testimony in addition to the record was received. (See the outcome of this hearing in the *second* Koontz case, 257 F.Supp. 295 (D. Md. 1966.)

■ This Court is of the opinion that such procedure is proper under the Rules and that the issues raised on the pending motion can be, and should be separately determined prior to trial upon comparison of the various indictments and upon evidentiary affidavits such as have been filed by both Honda and the government in this case.

## DOUBLE JEOPARDY—ONE OR SEVERAL CONSPIRACIES

The subject of double jeopardy and multiple penalty in criminal prosecutions under the Sherman Act has been considered in a number of cases which can be grouped according to the various situations in which the question arose.

In American Tobacco v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Montrose Lumber Co. v. United States, 124 F.2d 573, 575 (10th Cir. 1941); United States v. Shapiro, 103 F.2d 775 (1939), the question was whether convictions on multiple counts separately charging conspiracy to restrain commerce under Section I and conspiracy to monopolize and monopoly under Section II, amounted to double jeopardy and multiple punishment for the same offense. Those Courts held that such multiple convictions and penalties do not violate the Fifth Amendment because each of the elements of Sections I and II of the Sherman Act constitutes a distinct offense.

In United States v. Anderson, 101 F.2d 325, 330 (7th Cir. 1939) and United States v. New York Great Atlantic & Pacific Tea Co., 137 F.2d 459 (5th Cir. 1943) the question was whether conviction of two or more defendants of conspiracy in violation of the Sherman Act should be reversed as prejudicial to some defendants because the alleged conspiracy amounted, not to a single, but to several different conspiracies with which some of the complaining defendants had no conspiratorial connection. In these two cases the Courts, examining the factual record, concluded that the evidence showed, not separate conspiracies, but a single conspiracy.

In United States v. Armco, 252 F.Supp. 364 (S.D.Cal.1966) the government had brought a two-count indictment, one charging defendants with a Sherman Act price fixing conspiracy with respect to subsurface pumps and parts through the United States from 1963 to date of indictment and the other count charging 7 of the same defendants with a similar conspiracy limited to California. The Court, after granting a severance of the counts for trial, then dismissed the count charging nationwide conspiracy upon hearing a witness. Certain of the common defendants then moved that the other count be dismissed as to them on the ground of double jeopardy. The motion was granted by the Court on the ground that "There is no substantive difference between the conspiracy charged in Count 1 and that charged in Count 2."

The only Sherman Act case in which the question was clearly presented, not in connection with a single prosecution but in connection with successive prosecutions, is United States v. Koontz, 257 F.Supp. 295 (D.Md.1966)—(the *second* Koontz case). In that case the defendant had previously been punished by a fine on plea of *nolo contendere* to an indictment charging conspiracy to allocate its school milk contracts. Thereafter the

defendant was indicted for conspiracy to fix prices at which its milk products could be sold to the regular retail and wholesale trade. Upon the evidence presented at a pre-trial hearing on motion to dismiss on the ground of double jeopardy, the Court found that the purpose of defendant was to maintain price stability in the Baltimore market and that their actions with respect to the school milk were designed to control certain aspects of distribution all of which were facets of an overall price structure and that the acts charged were part of the same conspiracy for which defendants had been previously convicted.

Non-Sherman Act cases, holding that convictions on an alleged single conspiracy should be reversed upon the ground that the evidence showed, not one, but several separate and distinct conspiracies have been cited by the government, for example, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (conspiracy to violate the National Housing Act); Canella v. United States, 157 F.2d 470 (9th Cir. 1946) (conspiracy by an army officer with others to defraud the government); Rocha v. United States, 288 F.2d 545 (9th Cir. 1961) (conspiracy to violate the immigration laws).

In these cases the Court merely laid down the principle that "thieves who dispose of their loot to a single receiver—a single fence—do not by that fact alone become confederates—they may be, but it takes more than knowledge that he is a 'fence' to make them such", adding "As the government puts it, the pattern was 'that of separate spokes meeting in a common center' though, we may add, without the rim of the wheel to enclose the spokes".

This Court agrees with this principle as applied to those cases. On the other hand, non-Sherman Act cases, holding that on the evidence single conspiracies were shown, rather than multiple separate conspiracies as claimed, are cited by defendant Honda, for example, Braverman v. United States, 317 U.S. 49, 63 S. Ct. 99, 87 L.Ed. 23 (1942) (conspiracy

to violate provisions of the Internal Revenue Laws); Lefco v. United States, 74 F.2d 66 (3rd Cir. 1934) (conspiracy to violate federal statutes prohibiting the use of the mails to further fraudulent schemes); Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) (conspiracy to violate the Emergency Price Control Act) (distinguishing the Kotteakos case, supra, saying: "Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects").

█ The cases cited, whatever conclusion may have been reached on the evidentiary record, demonstrate that the issue of a single conspiracy or separate conspiracies is one of fact and that the test is well and briefly reiterated in the second Koontz case (257 F.Supp. 295 at 305) i. e.: " * * * If there be a common, continuing objective of the parties, there is a single offense, despite the existence of diverse ways and means used to accomplish it", citing Braverman v. United States, 317 U.S. 49, 52–54, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Short v. United States, 4 Cir. 1937, 91 F.2d 614, 617–618, 112 A.L.R. 969; United States v. Swift (D.C.Ill.1911), 188 F. 92, 97.

The question in the pending case, therefore, is whether the record presented by defendant American Honda is sufficient to meet its burden of establishing that it and the dealers in all the areas involved, (Greater Los Angeles Area, San Francisco Bay Area, Chicago Area and Ohio Area) had a *common, continuing objective of fixing, maintaining and stabilizing the retail prices of the product in all areas on a virtually nationwide scale.* If so, the conspiracy would be one conspiracy—notwithstand-

984

ing that the common objective was furthered in diverse ways by different co-conspirators in separate sections of the nation who may not have been in actual, conspiratorial contact with one another.

If, on the other hand, the alleged co-conspirators with Honda in the several areas *did not share with Honda any such broad objective but merely and solely aimed to maintain retail prices in their own, respective areas of competition,* then, of course, the objective of American Honda (maintaining its prices nationally in all areas) would break down into several separate conspiracies according to the point or place at which the objectives of Honda coincided with the objective of its dealers.

Contending that all of the four claimed separate conspiracies involve a common objective of both American Honda and all dealer co-conspirators, defendant Honda presented affidavit evidence at the hearing tending to show that Honda dealers in each of the various competitive areas are concerned with the retail price structure in all other areas; that price cutting affects the ability of a dealer to maintain proper servicing of the product and its parts and adequate advertising; that this in turn affects the reputation of the product; that purchasers of this kind of product are impressed by dealer ability to provide servicing in other areas; that dealers in all areas are concerned with discounting anywhere because discounting anywhere tends to start discounting in other areas; that news spreads through national magazines; that dealers in one area visit with dealers in other areas and read about other areas; that widespread price stability is strong inducement to prospective dealers; that, for example, the younger set in all areas looks to Los Angeles as the "pace setter" for this product and that discounting in any area also affects the trade-in value of the product as compiled for the trade Blue Book.

The American Honda affidavits are also to the effect that in 1960, when it began the distribution of Honda products in the United States, it was a Japanese owned company lacking knowledge of the anti-trust laws of the United States as related to so-called fair trade practices; that it acted upon the suggestion of its first sales manager to the effect that, according to accepted practice in the industry it should require its dealers to abide by its suggested prices; that at no time thereafter until late 1964 did it have any doubts concerning the legality of its pricing policy; that only in 1964, when it was threatened with legal action by a former dealer, did it receive from its present legal counsel advice which led it to discontinue its so-called fair trade pricing policy and to notify all its personnel and dealers accordingly; and that since December 4, 1964, it has been and now is its policy to make no suggestion concerning retail prices.

The government, on the other hand, has presented affidavit evidence tending to show that American Honda product price-fixing activities originated among San Francisco Bay Area dealers themselves; that American Honda representatives participated both there and in the Los Angeles activities; that the San Francisco Bay Area Dealers Association and the Los Angeles Dealers Association did not meet with or contact one another; that price stabilization suggestions from American Honda to either of these dealers' groups was always specifically addressed to the local dealer groups; that the price fixing meetings and activities of Honda representatives and these local groups involved only the respective local areas; that dealers in one region were not concerned with what was going on price-wise in other areas; that the local dealer groups made some subsidiary price agreements among themselves and on their own concerning certain models, accessory prices and "give away" practices; that the local dealer groups sometimes rejected or modified suggestions from American Honda and that the local dealer groups in San Francisco and Los Angeles continued price fixing after being notified by American Honda that

as the result of a threatened private anti-trust action against it, by a Los Angeles dealer, it would no longer participate in price stabilization.

The government affidavits also show that the anti-trust investigation originated on the recommendation of the Los Angeles Field Office of the Anti-trust Division; that the first grand jury presentation was in Los Angeles; that, although there was no indication at the time that price fixing extended beyond the Los Angeles area, the presentation did encompass, not only Los Angeles, but similar activities in San Francisco and other areas; that this was done because of the known nationwide operations of American Honda; that the Los Angeles presentation confirmed price fixing in the Los Angeles area and also indicated "similar but distinct conspiracies" in San Francisco and other areas; that, although the evidence was complete as to Los Angeles it was incomplete as to the other areas since testimonial evidence came almost entirely from Los Angeles dealers and local American Honda representatives; that American Honda was notified prior to its *nolo contendere* plea in Los Angeles that further grand jury presentations would follow in the other areas; that American Honda was not required to resubmit documentary evidence that had already been presented at Los Angeles; that all the co-conspirator defendants indicted in San Francisco and other areas are different as to each of those areas and also different from those indicted in Los Angeles.

Considered as a whole, the evidentiary record shows that the products in question were nationally advertised and nationally distributed by American Honda; that the objective of American Honda was to fix and maintain prices in all regions where its product was distributed; that dealers in the various regions received advertising material showing the suggested prices; that dealers in the various regions were told by regional managers of American Honda's nationwide so-called fair trade attempt to stabilize prices of the products everywhere; that the for-

mation of dealers associations in the various regions was part of Honda's policy for furthering, not only national advertising, but national price maintenance; that dealers in each regional association were aware of similar dealer associations in other regions; that dealers and associations in one region at times communicated with one another regarding matters of common interest, including pricing structures; that the purpose of American Honda's pricing policy was to assure prestige of the product that would be lost if discounting was practiced in any region and allowed to spread; that price maitenance was designed to assure, not only dealer profit, but also dealer ability to maintain a corresponding high quality of servicing and advertising—all to maintain the prestige of the product; that this prestige maintained in this manner, was an inducement to acceptance of dealerships in the various regions.

It is unrealistic to conclude that dealers in one region were wholly unconcerned with the maintenance of prices in other regions and concerned only with price maintenance by dealers in their own particular region. Although the degree of concern might have been greater as to price maintenance, *vis a vis* discounting among dealers within a particular region, dealers in every region, nevertheless, had a stake in maintaining an overall national pricing policy which, if allowed to deteriorate into discounting in one region, would soon spread to invite discounting in other regions.

Although their concern with nationally maintained price maintenance may have been less urgent than with regional maintenance, it is difficult to conclude that local dealers and associations did not share with American Honda the objective of which the dealers in all regions were beneficiaries. To this extent and in this respect local dealers and regional associations shared a common objective with American Honda.

If there was such a sharing of a common objective, which local dealers and regional associations furthered by con-

tributing their part, it would make no difference that dealers and associations came into the nationwide conspiracy at different times and at different places, or that they did not personally know one another or all details of the conspiracy everywhere or that there were local variations—so long as it could be found that they shared American Honda's objective.

■ As stated in American Tobacco v. United States, 147 F.2d 93 (6th Cir. 1945), the character and effect of a conspiracy are not to be judged by dismembering it and viewing it in its separate parts but by looking at it as a whole. It is the common design which is the essence of the conspiracy or combination and this may be made to appear when the parties steadily pursue the same object whether acting separately or together, by common or different means but always leading to the same unlawful result.

So far as the issue of single conspiracy vis a vis separate conspiracies is concerned, the factual situation shown by the record is not essentially different than in United States v. Anderson, 101 F.2d 325 (7th Cir. 1939); United States v. Armco, 252 F.Supp. 364 (S.D.Cal. 1966); United States v. New York Great Atlantic & Pacific Tea Co., 137 F.2d 459 (5th Cir. 1943); United States v. Koontz, 257 F.Supp. 295 (D.Md.1966); Lefco v. United States, 74 F.2d 66 (3rd Cir. 1934). See also: United States v. General Electric, 40 F.Supp. 627 (S.D. N.Y.1941).

On the other hand, we believe the factual situation here is clearly distinguishable from those in Kotteakos, Canella and Rocha, supra.

Defendant makes the further argument that Section I of the Sherman Act is directed at "a course of conduct", rather than each specific conspiracy that goes to make up such course of conduct, citing United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952); (Fair Labor Standards Act re employees' working conditions); Halverson v. United States, 162 F.2d 308 (9th Cir. 1947) (2d War Powers Act re allocation of materials and facilities); United States v. Personal Finance, 174 F.Supp. 871 (S.D.N.Y.1959) (Defense Production Act of 1950 re consumer credit controls), none of which cases involved the Sherman Act.

■ Whether any particular statute is directed against specific acts or only against a prescribed "course of conduct" involving such acts, depends upon the form and purpose of the statute involved. Defendant cites no case holding that the Sherman Act is applicable only to a course of conduct rather than to each separate conspiratorial violation.

■ In the opinion of this Court each conspiracy in violation of the Sherman Act constitutes a distinct violation and may be prosecuted as such. However, that may be, the only question presented in the pending case is whether a conspiracy, found to be a single conspiracy to fix, maintain and stabilize the prices of a nationally distributed product on a nationwide basis, can be fragmented by the government into multiple, distinct conspiracies in such manner as to subject any one of the conspirators to multiple prosecution, conviction and penalty.

■ The Court concludes that such conspiracy should not and cannot be so fragmented and that defendant American Honda, having once been prosecuted, convicted and penalized for its conspiratorial activity, cannot be again so prosecuted, convicted or penalized and that on the record here such would be contrary to the double jeopardy provision of the Fifth Amendment.

To hold that defendant American Honda cannot be again prosecuted, convicted or penalized for its part in the conspiracy does not mean that others, who shared and furthered the conspiratorial objective, cannot be prosecuted, convicted and penalized in any district where acts in furtherance of the conspiracy were committed.

Title 18 U.S.C. § 3237, provides that offenses begun in one district and completed in another, or committed in more

than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed.

■ Further, a criminal prosecution for conspiracy to restrain commerce (as distinguished from a civil action by private parties) may be brought as against all conspirators in any district where an overt act in furtherance of the conspiracy has been committed. Boston Medical Supply Co. v. Lea, 195 F.2d 853 (1st Cir. 1952); United States v. United States Steel, 233 F.Supp. 148 (S.D.N.Y.1964).

Actually, the government originally set out to prosecute Honda in Los Angeles for all its nationwide activities, but, when the indictment was returned, the charge was limited to the Greater Los Angeles Area.

## DUE PROCESS—HARASSMENT

■ Defendant Honda further contends, and we think properly, that entirely apart from the double jeopardy provision of the Fifth Amendment, successive grand jury inquiries and indictments for alleged separate conspiracies arising out of the same transaction may, and in this situation do, constitute harassment in violation of the Due Process provision of the Fifth Amendment, which provision, as explained by Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 95 L.Ed. 817 (1951), is essentially a recognition of the requirement of fundamental fairness and fair play under a given set of circumstances.

In Barnett v. Gladden, 375 F.2d 235 (9th Cir. 1967), a habeas corpus petition involving the question of whether a second prosecution by the State of Oregon deprived petitioner of Due Process within the meaning of the Fourteenth Amendment, the Court recognized at page 237, that:

"Apart from the Double Jeopardy Clause of the Fifth Amendment, however, the Due Process Clause of the Fourteenth Amendment, standing alone, imposes some limitations on a state's power to prosecute an individual who has previously been prosecuted for the same offense. Thus in *Bartkus* [Bartkus v. People of State of Illinois], [359 U.S. 121] at page 127, 79 S.Ct. 676 [3 L.Ed.2d 684], the Supreme Court interpreted *Palko* [Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288] as holding that at some point the cruel harassment of multiple prosecutions by a state would offend due process."

The vice of harassment through *successive* prosecutions, as distinguished from *contemporaneous* multiple prosecutions, has been well stated by Brennan, J., in his separate concurring opinion in Abbate v. United States, 359 U.S. 187, at 196, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), where he points out that the basis of Fifth Amendment protection against double jeopardy is that a person shall not be harassed by separate trials; that an accused should not have to marshal the resources and energies necessary for his defense more than once for the same alleged criminal acts; that the underlying idea is that the government with all its resources should not be allowed to make repeated attempts to convict an individual; that to permit the government statutorily to multiply the number of offenses resulting from the same acts, and to allow *successive* prosecutions for several offenses, rather than merely the imposition of consecutive sentences *after one trial* of those offenses, would enable the government to "wear the accused out by a multitude of cases with accumulated trials"; and that protection from such harassment cannot be thwarted either by the same evidence test or by the test of whether the proscribed conduct offends different federal statutes protecting different federal interests.

Although Brennan, J., was speaking of successive prosecutions under *different* federal statutes, his reasoning applies with equal, if not greater force, to successive prosecutions for alleged *different conspiracies* in violation of the *same statute*, e. g., the Sherman Act.

Indeed, the government itself has recognized that its policy should be and is "that several offenses arising out of a single transaction should be alleged and tried together, and should not be made the basis of multiple prosecutions, a policy dictated by considerations of fairness to defendants and of efficient and orderly law enforcement." Petite v. United States, 361 U.S. 529, 530, 80 S.Ct. 450, 4 L.Ed.2d 400 (1960) (Solicitor General's Statement on motion to remand an appeal.) (See also, Marakar v. United States, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 [1962]). The basic unfairness of any other policy has been considered and recognized in In re National Window Glass Workers et al., 287 F. 219 (N.D.Ohio 1922).

This Court finds that the requirement of fundamental fairness and fair play has not been met in the instant case. Here, subpoenas calling for large quantities of documents were issued in the original Los Angeles Grand Jury investigation. Included were documents of the dealers' associations throughout the United States. More than six thousand pages of documents from all over the country were produced in Los Angeles for consideration by the Grand Jury.

Shortly thereafter, subpoenaes were issued in San Francisco requiring the production again of virtually all of the documents for San Francisco that were produced in Los Angeles. The pattern was similar in Columbus and Chicago. The Department of Justice has indicated that, on its theory of separate local conspiracy, many more separate but similar indictments—possibly more than 30—could be returned against Honda and its 33 dealer associations throughout the nation—unless the Department decides to extend consideration by not seeking any more indictments *against Honda* beyond the four already returned.

The present prosecution, together with the similar pending prosecutions in Illinois and Ohio, already above referred to, is precisely the sort of harassment that the requirements of fundamental fairness and fair play are intended to prevent.

Upon the record, the Court finds and concludes that the conspiracy here charged against defendant, American Honda, is part of a single conspiracy for which that defendant has previously been convicted and penalized, as already above set forth, and that the pending prosecution subjects it to double jeopardy in violation of the double jeopardy clause of the Fifth Amendment.

Further, upon the record, the Court finds and concludes that the successive, multiple prosecutions for offenses arising out of the same transactions and course of conduct, constitute in effect a harassment of said defendant in violation not only of the double jeopardy clause but also of the due process clause of the Fifth Amendment.

Accordingly, it is the order of this Court that the motion of defendant American Honda to dismiss the indictment (as to it) be granted.

This Memorandum of Decision constitutes the Findings of Fact and Conclusions of Law of this Court.