**Earl WELCH, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 8097.**

United States Court of Appeals
Tenth Circuit.

June 22, 1966.

Certiorari Denied Nov. 21, 1966.
See 87 S.Ct. 395.

Rehearing Denied Aug. 9, 1966.

·V. P. Crowe, Oklahoma City, Okl. (Paul R. McDaniel of Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, Okl., and Tom Finney, Idabel, Okl., on the brief), for appellant.

Donald A. Hansen, Washington, D. C. (Richard M. Roberts, Acting Asst. Atty. Gen., Bruce Green, U. S. Atty., E. C. Nelson, Asst. U. S. Atty., Joseph M. Howard and Willard C. McBride, Washington, D. C., on the brief), for appellee.

Before LEWIS and BREITENSTEIN, Circuit Judges, and STANLEY, District Judge.

DAVID T. LEWIS, Circuit Judge.

Appellant, a former Justice of the Supreme Court of Oklahoma, was found guilty by a jury verdict on all five counts of an indictment charging him with wilfully and knowingly attempting to evade income taxes for the years 1957 through 1961 in violation of 26 U.S.C. § 7201 and was sentenced to concurrent prison terms of three years and fined $13,500. Thereafter appellant filed a motion for judgment of acquittal or alternatively a motion for a new trial, both of which were denied. He now seeks review of the order overruling his post-trial motions and of the judgment entered pur-

suant to the jury verdict. The issues before us arise in the main from appellant's contentions that jury prejudice should be presumed from the widespread news coverage preceding and during the trial and that the court erred in certain evidentiary rulings and in not allowing a new trial as a result of juror misconduct.

Using the net worth and nondeductible expenditure method of accounting the government determined that appellant had an unreported taxable income of $41,826.60 during the prosecution years of 1957–1961. The government's computation is premised upon an accounting of appellant's income and expenditures throughout his years of professional service from 1912 to 1955. During this period Justice Welch practiced law in Antlers, Oklahoma from 1911 to 1926, served as state district judge from 1927 to 1932 and was a Justice of the Oklahoma Supreme Court from 1933 to 1961.

Appellant claimed that his unreported, nondeductible expenditures for the years in question came from an accumulated cash fund of over $56,000 and not from income. The government, however, introduced extensive and detailed evidence, too voluminous for our definitive presentation, in establishing that its indictment was based upon the expenditure of unreported income rather than the claimed accumulated cash funds.

A summary of the government evidence showed that appellant spent $17,521.00 in excess of receipts from 1912 through 1955 making it impossible for him to have acquired a large cash fund. On the other hand appellant presented evidence that he had saved $56,000.00 in cash funds by the end of 1956. In refuting this claim the government contended that even if it used the figures furnished by the appellant, he would have accumulated no more than $36,750.00 by 1933 and that this cash fund would have necessarily been expended by 1956. The

issue presented to the jury for factual determination was whether Justice Welch did or did not have a cash hoard sufficient to offset his expenditures during the prosecution years. The sufficiency of the evidence to support the verdict of guilty is not attacked directly on appeal but serves as a premise for the claim of error in the admission of evidence and as a background for the asserted prejudicial impact of publicity upon the trial.

Justice Welch was indicted on April 9, 1964, at Oklahoma City. Upon that same date and by the same grand jury Justice N. S. Corn, at such time a supernumerary member of the Supreme Court of Oklahoma, was charged in a separate indictment with similar offenses. On July 1, 1964, Justice Corn entered a plea of *nolo contendere* to the counts of his indictment and was sentenced to a fine and concurrent imprisonment terms of eighteen months. The United States represented to the sentencing judge that Justice Corn had received a bribe of $150,000 in return for a favorable judicial decision in a state supreme court case and that he had indicated to a witness that the money was to help him and "other members of the Supreme Court in meeting campaign expenses." This statement of the United States District Attorney together with Justice Corn's plea and sentencing received extensive publicity in all forms of news media. And securely packaged in the news coverage was the fact of appellant's pending trial, his association with Justice Corn, the assertion of corruption of Justice Corn and "others," and the linking of the name of Hugh A. Carroll, a former president of Selected Investments Corporation, as a "witness."[1]

Trial of appellant's case began on October 5, 1964, at Muskogee, Oklahoma, after transfer from the Western to the Eastern District of Oklahoma. Publicity

---

1. The Oklahoma City Times reported on July 1:

"Government attorneys charged Wednesday that Supernumerary Judge N. S. Corn and 'others' on the state supreme

Court received $150,000 in return for a favorable ruling in a pending case.

Shortly after disclosure that the government's charge was the basis of a federal income tax evasion indictment against

of the proceedings continued in the same vein and appellant's motion for continuance upon claim of prejudice therefrom was denied. During the course of the trial the government called as witnesses both Justice Corn and Hugh A. Carroll in an attempt to show a probable source of income to appellant. Justice Corn invoked the Fifth Amendment and declined to answer any questions. Carroll testified to the bribery of Justice Corn but did not implicate Justice Welch. The testimony was taken in open court but in the absence of the jury, appellant's motion to hear the witnesses in chambers having been denied. The court ruled the testimony to be inadmissible. News media headlined the appearance and testimony of these witnesses.

■ In urging that appellant did not receive a fair trial before an impartial jury because of the attendant publicity given the proceedings, no claim of actual prejudice or specific error in the application of traditional safeguards by the trial court is made. And the record reveals no proven prejudice nor trial error. Voir dire examination of prospective jurors was complete and, perhaps surprisingly, revealed that the panel members had little knowledge of the case beyond the fact of its existence. None was challenged for cause. The trial jury was properly and repeatedly instructed not to read or listen to news media during the trial and their responsibilities in such regard were made emphatically clear to them. The jury was allowed to separate at night and over a weekend but no request to impound them was made. But, says appellant, these traditional procedures of accepting as unprejudiced a juror who subjectively so states although exposed to publicity, of placing reliance upon the impact of court instructions to avoid juror exposure to trial publicity, of requiring an affirmative showing the existence of prejudice, are each but "reality-obscuring myths" which should be rejected in view of the present-day exposure and influence of news media on the common life. In sum, appellant says he did not have a fair trial because he could not have one under a reality-recognizing legal concept of justice and due process. We cannot approve such a legal philosophy and find no support for it in the decisions of the Supreme

---

Corn, the 80-year-old retired justice was sentenced to 18 months in prison and fined $11,250.

\*　　\*　　\*　　\*　　\*

A statement read by U. S. Attorney B. Andrew Potter who was flanked by two justice department attorneys, did not identify by name the person they said gave the $150,000 to Corn.

Potter merely referred to a 'witness who was interested in a case pending before the Oklahoma Supreme Court in 1956.'

One of the witnesses who testified before the federal grand jury that indicted Corn and Justice Earl Welch April 8 was Hugh A. Carroll, onetime president of the now-defunct Selected Investments Corp.

\*　　\*　　\*　　\*　　\*

Welch is accused of evading $13,364 in taxes for 1957 through 1961. He pleaded innocent and his case has since been transferred to the eastern district at Muskogee.

\*　　\*　　\*　　\*　　\*

But Potter said the government had both oral and documentary evidence, if the case had gone to trial, to prove another source of the net worth increases resulting in unreported income.

He said the testimony would show that in 1956 the 'witness' told Corn that, unless the court reversed a lower court's decision in the pending case, the corporation the 'witness' controlled would suffer a tremendous loss.

Potter said Corn asked the 'witness' how much it was worth to him for the favorable decision.

'Worth $150,000

'\*　\*　\*　The witness told the defendant it was worth $150,000 to which defendant replied that he felt something might be worked out,' Potter related.

He pointed out the supreme court reversed the lower court decision in 1957, whereupon the 'witness' paid $150,000 most of it in $100 bills, to Corn.

Corn indicated to the 'witness' that the $150,000 would go to help himself and 'other members of the supreme court in meeting campaign expenses,' Potter charged."

Judge Welch had authored an opinion favoring Selected Investment Corporation in a 1957 decision.

Court termed "revolutionary" by appellant.

In support of post-trial motions appellant submitted affidavits indicating that headlined papers were prominently displayed in the lobby of a hotel where some of the jurors stayed. Another affidavit indicated that some conversational speculation occurred among members of the trial jury as to what was occurring and who might be testifying (including mention of Corn and Carroll) during a period when the jury was excused. In regard to the latter we have no doubt that jurors often speculate about trial proceedings conducted out of their presence, sometimes accurately, as here, and sometimes inaccurately, also as here. And for what it is worth, we accept as a reality the natural and human frailties of jurors, such as curiosity, as potential instruments of prejudice.

■ Fairness in the administration of justice is not a one-way street to be approached only through an entrance limited to the accused. His cause cannot be submitted to automated jurors existing in complete sterility. And prominence of position deserves no special consideration. To the contrary, the administration of justice requires that the personal and professional conduct of any judge be a subject for public concern and knowledge, continued scrutiny, and, in proper instances, authoritative action. News media not only have a right to report upon the subject, Estes v. State of Texas, 381 U.S. 532, 541, 85 S.Ct. 1628, 14 L.Ed.2d 543, rehearing denied, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118, but have a professional duty to do so that extends beyond the term newsworthy. The exercise of free reporting, the so-called "extensive publicity" given to a case, is a right that must be balanced against the right of an accused to be tried by an impartial jury but does not dictate the conclusion that prominence brings prejudice. But we agree that the prominence of publicity *may* produce prejudice, actual or so inherent in the circumstance that realism requires its recognition. We reject, therefore,

appellant's argument that he *could* not receive a fair trial because of his high position and the attendant publicity of his arrest and trial and turn to the question of whether he *did* receive a fair trial. And, in such regard, we consider the decisions of the Supreme Court that appellant terms "revolutionary" to be, indeed, realistic.

In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, jurors hearing a routine criminal case were exposed, during the course of the trial, to newspaper articles of a reckless nature covering matters far removed in time and space from a factual report of the trial occurrence. The accounts apprised the jurors of the defendant's prior criminal record and other matters which the trial judge had earlier ruled prejudicial and inadmissible. Exercising its supervisory powers, the Supreme Court ordered a new trial indicating that evidence which reaches a jury through news accounts is almost certain to be as prejudicial as when it is part of the prosecution's evidence. The Court added: "It may indeed be greater for it is then not tempered by protective procedures." Marshall v. United States, supra at 313, 79 S.Ct. at 1173.

■■ *Marshall* can be distinguished from the case at bar in several ways. There the jurors were actually exposed to extraneous matters during the course of the trial; here there is no showing that any juror violated the court's instructions and admonitions nor was actually exposed to the news or views of communication media. To conclude that appellant was denied a fair trial because of the factual reporting of Judge Corn's appearance in court and the witness Carroll's inadmissible testimony requires the application of dual presumptions: that the jurors were both exposed to the publicity and were prejudiced thereby. The law will presume neither, see Beck v. Washington, 369 U.S. 541, 558, 82 S.Ct. 955, 8 L.Ed.2d 98, rehearing denied, 370 U.S. 965, 82 S.Ct. 1575, 8 L.Ed.2d 834; Latham v. Crouse, 10 Cir., 330 F.2d 865, 867–68, cert. denied, 379 U.S. 866,

85 S.Ct. 134, 13 L.Ed.2d 69, and appellant has failed to show either as a "demonstrable reality," United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331.

In *Marshall* the jurors were interrogated by the trial judge during the trial itself as to the subjective effect of the publicity to which they had been exposed. Each juror expressed the view that he was not and would not be prejudiced by the newspaper account. The jurors' self analysis of their state of mind and the trial judge's concomitant finding in such regard were held not sufficient to assure a fair trial. But the situation in *Marshall*, coming as it did during the course of the trial, denied to that defendant the right to reject each juror's claim of freedom from prejudice and he was forced to submit his cause to the jury already impaneled. In the case at bar, the proven exposure of the jurors to publicity was limited to the reporting of pre-trial events, essentially the events of simultaneous indictment of appellant and Corn and the sentencing of the latter. See n. 1, supra. The procedural safeguards of voir dire examination and challenge, the latter denied by circumstance in *Marshall*, were here present and fully available to appellant. And the record reveals a voir dire completely satisfying the standards set by the Supreme Court and expressed in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed.2d 751, and Beck v. Washington, supra.

Counsel for appellant, in a careful and comprehensive brief in support of their claims of prejudice from publicity, have referred us to many cases and legal writings pertaining to the continuing conflict between the concepts of a free press and the individual's right to a fair and impartial trial by jury. In general the factual background of such cases may be roughly categorized in three groups or combinations of groups: those in which actual exposure to prejudicial publicity occurred as in *Marshall;* those in which

procedural safeguards were denied to the appellant as in Irvin v. Dowd, supra, and Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846; and those in which the outcome of a trial was poisoned [2] by accompanying incidental publicity as in Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, and the publicity inspired trial in Sheppard v. Maxwell, 86 S.Ct. 1507, decided June 6, 1966.

██ We find no compulsion in any of the cited cases indicating an actual or inherent unfairness in appellant's trial. The record in no way reveals that the trial was held at a time or place containing an excited populace and we find no error in the refusal of the trial court, after transfer of the case to Muskogee, to grant a continuance. Nor do we deem the trial court's refusal to hear in chambers the government's proffer of the testimony of Corn or Carroll to be an abuse of discretion. The traditional rule was followed, Rule 26, Fed.R.Crim.P. The speculation of the jurors, while excused, as to the reason for their exclusion, was just what the term implies and nothing more. It would have occurred regardless of whether the trial court considered the government's proffer in open court or in chambers. We conclude that appellant was denied no procedural safeguard either requested or incumbent upon the trial judge to accord him regardless of request.

Nor do we find any persuasive comparison between the case at bar and the decision in *Estes* or the factual background in *Sheppard.* In contrast to *Estes*, the trial court was in complete control of the trial and conducted it throughout in an atmosphere unmarked by diversion. The attendant publicity, both before and during the trial, was factual reporting, extensive but not "poisoned" by a self-appointed vindictive or crusading news media. Appellant's conviction was in no way inspired by or the result of trial by newspaper as is claimed in *Sheppard.*

---

**2.** Indicated by Mr. Justice Frankfurter to have occurred in *Janko.* See concurring opinion, Irvin v. Dowd, 366 U.S. at 730, 81 S.Ct. 1646.

■ Appellant also places argumentative emphasis upon the claim that government fed fuel to the newspapers by allowing the grand jury to indict appellant and Corn at the same time and by calling Corn as a witness after receiving information that Corn would demand the shelter of the Fifth Amendment; and appellant concludes that the jury verdict, returned in one hour and forty-eight minutes after a two-week trial, is indicative of deep rooted, extraneous prejudice flowing from the overall publicity. We can place no legal significance upon the argument for we know of no rule prohibiting simultaneous indictments nor requiring the acceptance of a claim to personal constitutional privilege before it is asserted and screened outside the jury's hearing, cf. Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278; neither can we give credence to appellant's conclusion of prejudice from the time of the jury's deliberation under the circumstances of this case.

In sum, we conclude that appellant both could have and did have a trial not violative of his rights through publicity.

■ As we have earlier indicated, it was incumbent upon the government, under its theory of accounting proof, to establish an opening net worth for appellant as a premise for its proof of guilt during the taxable years of the indictment charge. Claim is made that the trial court erred in admitting evidence, presented in support of the government's burden, concerning the circumstances surrounding the purchase of a home in 1953 in the name of Mr. and Mrs. Taylor, sister and brother-in-law of the then Mrs. Ruby Myers. Judge Welch married Mrs. Myers in 1959 and was married to Mrs. Fern Welch in 1953. The government contended that Judge Welch furnished the sum of $7,698.45 for the purchase of the home in 1953 and thus lessened his cash assets by such amount. The government's evidence may be stated in conclusionary outline as follows: That appellant was well acquainted with and frequently visited with Mrs. Myers and the Taylors at least as early as 1947; that in 1949 he stated that he was negotiating for a house on North Robinson between 25th and 26th for a lady acquaintance to live in; that he inspected the subject house (2620 North Robinson) prior to its purchase and was present at the closing of the sale and vouched for Taylor's qualification for a loan; that neither Mrs. Myers nor the Taylors had assets nor income with which to buy the house; that Mrs. Myers lived in the home alone from 1956; that in 1955 the Taylors quitclaimed the home to Mrs. Myers without consideration; that Judge Welch married Mrs. Myers on June 27, 1959 and moved into the home; that the quitclaim deed was recorded in August of that year; that the property was sold in 1962 and the Taylors received nothing from the proceeds; that the Taylors made the original purchase payments by checks drawn upon accounts to which anticipatory deposits had been made; that Judge Welch made substantial withdrawals from his savings accounts at such time.[3]

■ Appellant does not directly attack the admission of this evidence as immaterial to the issues nor as insufficient in circumstance to support an inference that such an expenditure was made. Rather, appellant asserts that the matter was over-emphasized by the prosecution, unnecessary for the case, and permeated the trial with innuendo of immorality, even adultery, entirely independent of a charge of tax evasion. Such argument probes the relevancy of the evidence and its admission into evidence is a matter largely within the discretion of the trial judge in his performance of the duty of directing the trial to the issues of the crime charged. The basic rules of law in such regard are well established. Evidence of the commission of crimes not charged, as such, is not admissible; evidence of unlawful conduct, material to the crime charged, should not be admitted if its admission

---

3. Other evidence showed that Judge Welch, on the date the purchase was closed, purchased $6,000 in cashier's checks that were not cashed until nearly a year later.

diverts the case into a "trial within a trial" and in actuality exposes the defendant to a conviction for a crime not charged, see United States v. Klein, D.C., 131 F.Supp. 807; but evidence tending to prove a material fact although incidentally showing the defendant to have committed another crime, or, as here, perhaps to indicate unconventional conduct, is not inadmissible because of a potential side effect. Ayash v. United States, 10 Cir., 352 F.2d 1009; O'Dell v. United States, 10 Cir., 251 F.2d 704. Judge Welch has been married three times and his expenditures in support of his marital experiences were necessarily a focal point in the government's case. The trial court did not abuse its discretion in allowing the government to prove the circumstances of the subject purchase of the home. And while we might agree with appellant that the evidence of the government was sufficient to warrant conviction even without the proof of the incident complained of, we know of no rule that requires the government to limit its presentation to a minimum case simply to avoid a sensitive area of proof.

 Appellant asserts that the trial court erred in refusing to provide him copies of appellant's and the government witness Kaszubowski's testimony before the grand jury. Judge Welch appeared voluntarily before the grand jury, testified at length, but did not testify in the case at bar. Kaszubowski testified both before the grand jury and in the case. However, this witness's testimony before the grand jury, except for some preliminary questions establishing identification, was not recorded. And although it is now clear that the need for grand jury testimony as a useful tool of defense is, in most instances, a matter for determination by counsel and not the court, Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, decided June 20, 1966, the instant case seems to present a clear exception to the rule announced in Dennis. The government here did not have exclusive access to "a storehouse of relevant fact"

in the grand jury proceedings. Judge Welch's own testimony would have served the defense no purpose as he did not testify at trial. The witness Kaszubowski's grand jury testimony did not exist in recorded detail except as we have indicated. The trial court did not invade the province of the advocate in refusing to produce it as a tool of defense utility.

 Appellant also claims that he was denied a fair trial because a juror, asked upon voir dire if he had had any near relatives who had been involved in litigation that had been reviewed by the Supreme Court of Oklahoma, did not disclose that his father had been disbarred in 1935 by an order of that court. We find no merit to the contention of existence of prejudice. The incident of disbarment 29 years before did not carry inherent prejudice as a matter of law nor can it be classified as a deliberate nondisclosure of an activity contained within the term "litigation." The trial court did not abuse his discretion in refusing a new trial in this regard. Brown v. United States, 10 Cir., 356 F.2d 230.

 Finally, appellant contends that he has been subjected to an excessive sentence in view of the fact that the same judge imposed a lighter sentence upon Judge Corn. Appellant subjectively concludes that he has been penalized for standing trial. Nothing in the record supports such a conclusion. To the contrary, significant differences in the age and health of the two offenders are immediately apparent and many other proper factors may have influenced the trial court's judgment. Since the sentence is well within the statutory limit this court will not interfere with the sensitive exercise of the trial court's discretion absent most unusual circumstances, none of which are here present. Jones v. United States, 10 Cir., 323 F.2d 864; Hayes v. United States, 10 Cir., 238 F.2d 318, cert. denied, 353 U.S. 983, 77 S.Ct. 1280, 1 L.Ed.2d 1142.

Affirmed.