Eugene Deikman, Denver, Colo., for appellant.

Richard T. Spriggs, Asst. U. S. Atty. (Lawrence M. Henry, U. S. Atty. for the District of Colorado, on the brief), for appellee.

Before LEWIS, BREITENSTEIN, and HILL, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Arthur Mares and Albert Mares were jointly indicted for violation of 18 U.S.C. § 2113(a) and (d) by the robbery of a federally insured savings and loan association in the course of which they put lives in jeopardy by the use of a pistol. On the motion of the government, separate trials were held with Arthur being tried first. Both were found guilty. We are concerned here with the appeal of Arthur. A separate opinion filed this day, 10 Cir., 383 F.2d 811, disposes of the appeal of Albert.

The evidence was entirely circumstantial. It is well summarized in the opinion of the trial court denying the motions for new trials.[1] Although the evidence of guilt is not overwhelming, it is more than sufficient to sustain the conviction.

Defense counsel urge that a reversal is necessary because of the publication, during the trial of Arthur, of a news article reporting a confession which had been excluded by the trial court. The circumstances are these. On July 1, 1966, Arthur and Albert were represented by counsel and entered pleas of guilty. Later that day, Assistant United States Attorney McDonald, at the request of the defendants, saw them in the office of the United States Marshal and discussed their cases with them. Their counsel was not present. In the course of the conversation the defendants admitted participation in the robbery. On July 10, the defendants stated in open court that their pleas were not voluntary but were coerced by the statement of their attorney that unless they pleaded guilty the government would indict the parents of Albert. The court permitted the guilty pleas to be withdrawn. The defendants thereafter secured other counsel.

On the third day of the trial, the prosecution called McDonald as a witness. In a hearing in open court, but out of the presence of the jury, it developed that the government intended to present through McDonald testimony of the oral confessions made on July 1. The court ruled the testimony inadmissible. Later that day, a Thursday, the court continued the trial until the following Monday. The jury, which was not sequestered during the trial, was permitted to separate after the court gave a strong and comprehensive admonition against reading, listening to, or watching reports about the trial.

The Friday morning edition of the Rocky Mountain News, published and circulated in Denver where the trial was being held, printed an article about the trial. It appeared under a bold and prominent headline reading "Robbery Confession Admission Denied." The text of the article covered the examination of McDonald and the ruling of the court on the offer of the government. It reported the guilty pleas, the admissions of complicity in the crime, and, inexactly and out of context, various statements made by the trial judge. It contained the subjective views of the writer that in making the decision the trial judge was "obviously reluctant" and "apologetic" and quoted the judge as saying that he "was regretful when true facts have to be omitted."

1. See United States v. Mares, D.C.Colo., 260 F.Supp. 711.

When the court convened on the following Monday, defense counsel moved for a mistrial on the basis of the mentioned article but did not request that the jury be polled as to whether any members had read it.[2] The court denied the motion for mistrial. Immediately after the guilty verdict was returned, the defense renewed the motion for mistrial and requested that the members of the jury be questioned on their knowledge of the newspaper report. The court refused to interrogate the jurors and again denied the motion for mistrial. The same points were raised in a timely motion for a new trial which was denied.

The situation presented has much similarity with Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. That case was concerned with a routine prosecution for violation of the food and drug act. During the trial, Denver newspapers printed articles which were derogatory to the accused and which included references to evidence that the trial court had held inadmissible. The trial court questioned the jurors on their knowledge of the news accounts. Six jurors had read or scanned the articles and all said that they were not influenced thereby. The court denied the motion for mistrial. We affirmed the conviction. See Marshall v. United States, 10 Cir., 258 F.2d 94. The Supreme Court, in the exercise of its supervisory powers, ordered a new trial. In so doing, the Court commented that each case relating to a claim of jury prejudice because of newspaper articles appearing during a trial "must turn on its special facts."[3]

The problem presented is incapable of a satisfactory solution. Media of publicity have the right to report what happens in open court. An accused has a right to a trial by an impartial jury on evidence which is legally admissible. The public has the right to demand and expect "fair trials designed to end in just judgments."[4] These rights must be accommodated in the best possible manner.

■■ The right to publish a prejudicial article does not carry with it the right of an accused to an automatic mistrial. Such an outcome would give to the press a power over judicial proceedings which may not be countenanced. An accused may not withhold an objection to publicity occurring during a trial until an adverse verdict has been returned. This procedure would permit him to take a gambler's risk and complain only if the cards fell the wrong way. If the trial judge becomes aware of the publicity and orders a mistrial sua sponte, the hazard exists of a claim of double jeopardy on a retrial.[5]

We realize that the problem will not arise if the jurors are sequestered and prevented from reading, hearing, and watching news accounts. We also realize that sequestration imposes a hardship on jurors and should be ordered only in unusual cases. In the case at bar, sequestration was not requested.

■ The government says, and the record shows, that the jurors were carefully admonished on their responsibility to refrain from exposure to publicity occurring during the trial. It has been well said that: "Appellate courts should be slow to impute to juries a disregard of their duties, * * *."[6] In Welch v. United States, 10 Cir., 371 F.2d 287, cer-

2. The pertinent part of the statement of defense counsel was: "We feel that the jury—that of the twelve jurors at least one of them is bound to have seen and read that headline and perhaps have gone farther, not being sure that the headline related to the case in which they were jurors. So, we think it would be improper at this point to bother the jury by inquiring from it; whether they have seen this headline; whether they have heard any of these news broadcasts."

3. 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250.

4. Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974.

5. See Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901, a 5–4 decision.

6. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439.

tiorari denied 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303, we reviewed the problem of jury prejudice because of publicity and we said that neither exposure nor prejudice will be presumed. We continue to agree with all these principles but, like all generalities, they are subject to exceptions in unusual cases. Marshall says that every claim of jury prejudice under the circumstances presented must turn on its own facts.

■ We have an extreme situation, the reporting during the trial of a withdrawn guilty plea and an excluded confession. If any juror even saw the headline and connected it with the trial in progress, the possibility that it would not prejudice that juror is so slight that it merits no consideration. Defense counsel called the article to the attention of the court immediately on the reconvening of the trial. Although he negatived rather than requested the polling of the jury at that time, this procedural tactic is not decisive. The article was presented as a ground for mistrial. The nature of the article was such that the trial court should have immediately ascertained whether any jurors had been exposed to it. This could have been done without any reference to the nature of the article. It should have been done by a careful examination of each juror out of the presence of the remaining jurors.[7] An *accused can have no meritorious objection to the ascertainment of the fact of exposure.*

■ The overriding interest is that of the public to secure justice in a controversy between the government and an individual. In the circumstances there was an "imperious necessity"[8] to ascertain the fact of exposure and thereafter to take such action as might have been appropriate.

■ We have no desire to deliver a homily on the well debated subject of fair trial and free press. An article of great prejudice to the accused was published in the midst of his trial. The right to publish may not destroy the right to a fair trial. We suggest that a little more restraint on the part of the newspaper would have prevented this conflict between basic constitutional rights. We also suggest to the trial judges that when prejudicial evidence is excluded after a hearing away from the presence of the jury, they ask the representatives of the press to forbear the publication or announcement of any account thereof until after the verdict of the jury. We believe that the responsible press will heed such a request.

■ We have given thought to a remand for the purpose of an appropriate interrogation of the jurors but have determined that after the passage of about eleven months no good purpose would be served. The jurors have separated and their memories have probably dimmed. Our conclusion is that the failure of the trial court to ascertain whether any of the jurors had been exposed to the prejudicial article makes a new trial imperative.

Several issues relating to the admissibility of evidence must be considered. Here a little background is necessary. Before the robbery, which occurred about noon on April 4, 1966, the defendant and his associate Albert were without funds. That afternoon, the two had ample cash to pay a substantial repair bill on Albert's car and to finance a shopping spree during which extensive purchases were made of various luxury items for the two of them and their girl friends.

■ The defense argues that no conspiracy was charged and that activities and statements outside the scope of any possible conspiracy were received in evidence. The indictment contained no conspiracy count but charged the defendant and Albert jointly with the substantive offense. We have held that in

7. See Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504, 508, cert. denied 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52.

8. See dissenting opinion of Justice Douglas in Gori v. United States, 367 U.S. 364, 371, 81 S.Ct. 1523, 6 L.Ed.2d 901.

such circumstances the acts and declarations of one are admissible against the other even though no conspiracy is charged.[9] This rule is subject to the qualifications that the existence of the conspiracy must be shown by independent evidence and that acts or declarations of one conspirator either before the formation or after the termination of the conspiracy are not admissible against a co-conspirator. The record here contains independent evidence of conspiracy to rob the bank and to conceal the proceeds of the robbery. The basic issue is whether the actions and statements complained of occurred after the termination of the conspiracy.

Witness Mary Valdez testified that at the request of defendant's wife she told Albert of a search being conducted of defendant's home and Albert said in effect that he wondered how they found out. Witness Lorraine Griego said that defendant and his wife asked her to hide some loose change and asked her to tell the F. B. I. that certain newly purchased clothes belonged to someone else. Lillian Medina testified that Albert asked her to hide other new clothes. These incidents all occurred the day after the robbery and before the arrest of either the defendant or of Albert. The statements were all circumstantial and spontaneous rather than narrative or testimonial.

In our opinion the evidence was admissible. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, is not in point. That was a Mann Act case in which the objectionable statement of a co-conspirator was made a month and a half after the interstate transportation and after the arrest of the conspirator against whom it was used. The Supreme Court said that at the time of the statement the "central aim" of the conspiracy

had "long since" ended.[10] In Gay v. United States, 10 Cir., 322 F.2d 208 (Dwyer Act), and in Woodring v. United States, 10 Cir., 367 F.2d 968 (interstate transportation of forged checks), we held that statements of a conspirator made after arrests were not admissible against a co-conspirator because the conspiracy had ended. In Woodring we said that "[t]he ending of a conspiracy depends upon the particular facts." [11] Here the conspiracy had not ended. The men were acting in concert to conceal the crime and to avoid detection. The spontaneous statements and acts of one were admissible against the other.

On the afternoon of the day of the robbery defendant appeared at a garage to pay a repair bill of about $80 on Albert's car. While there he displayed a $100 bill.[12] In the course of a conversation over the money which he had, defendant stated "Albert has gotten his income tax check refund." Also on the same afternoon the defendant told witness Griego that Albert had gotten money from "his tax refund" and had given him, the defendant, $100. The government produced a witness from the Internal Revenue Service who testified that a claimed refund of $129.88 was not paid to Albert until after April 22, 1966. The defense says that the receipt of this evidence contravenes 26 U.S.C. § 7213 (a) (1) which relates to the non-disclosure of income tax returns.[13] The statute forbids disclosure of "the amount or source of income, profits, losses, expenditures, or any particular thereof". Here there was no such disclosure. All that was disclosed was the fact and payment of a refund. This was relevant to show the falsity of defendant's statement concerning the source of the money which he paid and displayed.

---

9. See Kelley v. United States, 10 Cir., 364 F.2d 911, 913, and Bartlett v. United States, 10 Cir., 166 F.2d 920, 925.

10. Id. at 442, 69 S.Ct. 716.

11. 367 F.2d 968, 969.

12. Several $100 bills were taken in the robbery.

13. This statute provides in material part: "It shall be unlawful for any officer or employee of the United States to divulge or to make known in any manner whatever not provided by law to any person the amount or source of income, profits, losses, expenditures, or any particular thereof, set forth or disclosed in any income return * * *."

The same IRS witness also testified that defendant had filed no income tax return for the year 1965. This testimony had no materiality or relevancy. Because the case is reversed for other reasons no need exists for exploring whether the receipt of the evidence was prejudicial. On retrial the evidence should not be received.

The last issue concerns the admission into evidence of $80.36 in coins voluntarily surrendered to an F. B. I. agent by the wife of the defendant. The argument is that no evidence connected these coins with the robbery. Included among the coins were $20 in fifty-cent pieces. The evidence showed that two rolls of fifty-cent pieces were taken in the robbery. The coins were in five boxes which were taken from a place of concealment in the defendant's house. In our opinion the evidence was material and relevant.

The judgment is reversed and the case is remanded for a new trial.

Albert MARES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 9347.

United States Court of Appeals Tenth Circuit.

Aug. 15, 1967.

Rehearing Denied Sept. 1, 1967.