UNITED STATES of America, Plaintiff,

v.

WILSHIRE OIL COMPANY OF TEXAS, Defendant.

No. KC-CR-873.

United States District Court
D. Kansas.

March 29, 1968.

Raymond D. Hunter, Antitrust Division, Dept. of Justice, Chicago, Ill., for plaintiff.

Robert J. Woolsey, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., for defendant.

## MEMORANDUM AND ORDER

ARTHUR J. STANLEY, JR., Chief Judge.

The defendant was convicted by a jury of violation of the Sherman Act (15 U.S. C.A. § 1). Among post-trial ,motions filed is a "Motion for Judgment or Acquittal Notwithstanding the Verdict and Renewal of Motion for Judgment of Acquittal and in the Alternative for a New Trial." No useful purpose would be served by extended discussion of the grounds of the motion other than Ground 5, which has to do with the claim that the jury was influenced by newspaper articles published during the trial. The offending news stories have been pre-

served in the record as Court's Exhibits 1, 2, 3 and 4, and consist of articles appearing, respectively, in The Topeka Daily Capital, The Kansas City Kansan, The Kansas City Star and The Kansas City Times.

Following the practices recommended by the Court of Appeals, Tenth Circuit, in Mares v. United States, 383 F.2d 805 (10 Cir., 1967), each juror was separately examined by the court. None had seen Exhibits 1, 2 or 4. Three of the jurors had seen the headlines which captioned the story appearing in the September 28, 1967 edition of The Kansas City Star. Each of the three, heeding the admonition of the court, had desisted from reading the story after being alerted by the headlines that it might have some peripheral connection with the circumstances involved in the case on trial. The headlines read:

"ATTEMPT MADE
AT OIL ACCORD

Kansas Highway Board
Meets With Counsel
for Firms

NO COMMITMENTS YET

Talks Explore Possibility
of Antitrust Settle-
ment"

The situation thus presented points up a dilemma confronting trial courts and jurors. The usual admonition, in this court at least, is to the effect that the veniremen must not read any news stories reporting on or in any way touching upon any aspect of the case on trial. Unless jurors are sequestered or denied the right to read any newspapers or to watch or listen to any television or radio programs, how may they determine, until headlines are seen or the broadcaster's opening sentence uttered, that what is to follow is something forbidden to them? Sequestration in the

ordinary case is expensive to the government and troublesome to the jurors and the marshal. Denial of access to all news media, even if enforceable, would impose undue restrictions on the jurors.

When prejudicial information is conveyed by the headlines themselves, as in *Mares,* the harm is done even though the juror reads no further. Here, the defendant was charged with conspiring to fix prices in the sale of liquid asphalt to the State of Kansas. The headlines read by Jurors Kidd, Burt, and Choplin contained information that there were negotiations for settlement of a civil suit brought by the State of Kansas and grounded on the same conspiracy as was involved in this case. Specific reference was made to the "possibility of antitrust settlement." Although there was no mention of Wilshire in the headlines, the defendant argues that a juror reading them would assume that the defendant was involved in the settlement efforts and would ask himself: "Why, if not guilty, does this company offer to compromise its civil liability?" (Actually, Wilshire was not a party to the reported negotiations).

Juror Kidd assumed that there was some connection between the headlines and the case. Juror Burt, after seeing the words: "Attempt Made at Oil * *" desisted from reading further "because I knew it was something, evidently, that had to do with this." Juror Choplin saw "the first big headline" and read no more, because she "thought it might pertain to that, so I didn't read it." It is clear, therefore, that the jurors who were exposed to the headlines realized that they referred in some manner to the conspiracy charged against the defendant. It is equally clear that all of them were mindful of the court's admonition and conscientiously observed it.

■■ We do not have here the situations present in *Mares* and in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). In *Mares,* the news story and its headlines reported an earlier confession by the defendant of his guilt of the very crime for which he was then on trial. In *Marshall,* the jurors were exposed to information as to prior offenses, evidence which the trial judge had ruled could not be admitted on the trial. Here, the story and the headlines read by the three jurors reported only that efforts were being made to settle a related civil case. Here, pursuant to pretrial stipulation, the jurors were informed at the commencement of the trial that other corporate defendants in this same case had entered pleas of *nolo contendere.* There is no reason to believe that the three jurors supposed when they read the headlines that reference was being made to any others than the co-defendants or that Wilshire was in any way involved in the settlement negotiations. Prejudice because of publicity will not be presumed. Welch v. United States, 371 F.2d 287, 291 (10th Cir.), cert. denied, 385 U.S. 957, 87 S. Ct. 395, 17 L.Ed.2d 303 (1966). As the Supreme Court has said, "the trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. * * * (E)ach case must turn on its special facts." Marshall v. United States, supra, 360 U.S. at 312, 79 S.Ct. at 1173.

■ Under the special facts in this case, I am satisfied that none of the jurors were influenced by the reading of the headlines and that there was no resulting prejudice to the defendant's right to a fair trial.

It is ordered that the defendant's motion be denied.