**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**WILSHIRE OIL COMPANY OF TEXAS,**
**Defendant-Appellant.**

**No. 87–69.**

United States Court of Appeals,
Tenth Circuit.

March 24, 1970.

April 23, 1970.

Rehearing Denied June 16, 1970.

W. Richard Haddad, Atty., Dept. of Justice, Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., John E. Sarbaugh and Raymond D. Hunter, Attys., Dept. of Justice, Chicago, Ill., on the brief) for plaintiff-appellee.

Robert J. Woolsey, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl. (Harry W. Colmery, of Colmery, Davis, Bennett, Leonard & McClure, Topeka, Kan., on the brief) for defendant-appellant.

Before LEWIS, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

On April 5, 1966, a federal grand jury for the District of Kansas indicted ten corporations [1] charging each with having violated 15 U.S.C. § 1. Specifically the indictment charged "the defendants and co-conspirators entered into and engaged in a combination and conspiracy in unreasonable restraint of the hereinbefore described interstate trade and commerce in liquid asphalt in violation of Section 1 of the * * * Sherman Act." All defendants except Wilshire plead nolo contendere and were subsequently fined from $25,000 to $40,000 each. Wilshire's case was tried to a jury and resulted in a guilty verdict and a fine of $25,000. Motions for judgment n.o.v., for judgment of acquittal, new trial and a motion to dismiss on double jeopardy grounds were all overruled, with the latter meriting a special hearing.[2] Wilshire has appealed.

---

1. The ten corporations indicted were: Wilshire Oil Company, Socony Mobil Oil Company, Skelly Oil Company, the Consumers Cooperative Association, American Petrofina Company of Texas, Union Asphalt and Roadoils, Colorado Oil and Gas Corporation, The American Oil Company (Standard of Indiana), Phillips Petroleum Company, and Apco Oil Corporation.

2. The defense of double jeopardy was first raised by Wilshire in a pre-trial motion at which time both parties agreed, with the court's permission, to submit the matter in a post-trial evidentiary hearing if Wilshire were ultimately found guilty. After conviction Wilshire renewed its attack upon the prosecution by reason of claimed double jeopardy and a special hearing on the issue was held. The burden was, by agreement of the parties, upon Wilshire. At the conclusion of the hearing, Wilshire requested that the trial court enter its findings of fact and conclusions of law under Rule 23, F.R.Crim.P., 18 U.S.C.A., which the trial court correctly deemed inapplicable. Nonetheless, upon Wilshire's request the court recited its findings, framing them

A thumbnail sketch of the uncontroverted facts reflects that Wilshire is a Delaware corporation which, in late 1960, purchased Riffe Petroleum Company and operated it as an unincorporated division of Wilshire until August, 1963, when Riffe was sold. It was during that period of time that Wilshire admittedly sold liquid asphalt to the State of Kansas and allegedly participated in an illegal conspiracy to fix the price of such asphalt. The charged conspiracy operated in the following fashion. The state is divided into six highway districts. Yearly the state asphalt buyer determines the location or "points" in each district which will require asphalt during the ensuing year. Bid invitations are then mailed to all asphalt sellers in the area. Upon the enclosed blank bid is a list of all the asphalt-requiring "points" in the state. The sellers then list the per gallon price at which they are willing to deliver the asphalt to each "point" on which they wish to bid. The sealed bids are then opened publicly and contracts are awarded to the lowest bidder on each "point." The alleged bid rigging operated on an over-under system. During each year involved and prior to submitting their "point" bids, the alleged conspirators met to agree on freight rates to the various districts and "points" and to set a base per gallon price. Before the meeting was concluded each company was assigned certain "points" which it was to win in the bidding. Then, on the basis of the prearranged formula, each company bid under formula price on each "point" allocated to it and over the base cost, plus rates, on others not assigned

to it. During the course of the conspiracy, from 1959–65, approximately 112,000,000 gallons of liquid asphalt valued at about $12,000,000 were sold and delivered by the named oil companies. Of the gross amount, about 2.6 million gallons were shipped in interstate commerce. Subsequent to the Wilshire-Riffe merger, it received contracts for ten to twelve million gallons per year, all of which were shipped intrastate.

■ On this statement of fact the appellant first argues that the indictment and evidence are insufficient since it is neither charged nor proved that Wilshire knowingly joined the conspiracy. We treat the indictment attack first. The fatal defect urged consists of a failure to allege that the conspiracy was formed and in existence; that Wilshire knew of its presence and knowingly agreed to join and commit acts in furtherance of its purposes. The single case cited as authority for this allegation[3] is inappropriate and discussion of it will be deferred until a timely moment. To determine the sufficiency of an indictment the court views the entire document[4] to ascertain whether the offense is charged with sufficient clarity so as to safeguard two constitutional guarantees: the Sixth Amendment right to be informed of the nature and cause of the accusation in order to prepare a defense; and the Fifth Amendment protection against twice being placed in jeopardy for the identical offense.[5] The indictment adequately apprised Wilshire of its participation in the conspiracy and was not faulty for the reasons urged. The defendants and co-conspirators were charged with entering into

---

in terms of the Government's burden of establishing beyond a reasonable doubt that there was not a single multi-state conspiracy.

3. Jones v. United States, 251 F.2d 288 (10th Cir. 1958).

4. Imperial Meat Co. v. United States, 316 F.2d 435 (10th Cir. 1963); Carlson v. United States, 249 F.2d 85 (10th Cir. 1957); United States v. Armour & Co., 137 F.2d 269 (10th Cir. 1943).

5. United States v. Tijerina, 407 F.2d 349 (10th Cir. 1969); Nelson v. United States, 406 F.2d 1136 (10th Cir. 1969); Woodring v. United States, 376 F.2d 619 (10th Cir. 1967); Frankfort Distilleries v. United States, 144 F.2d 824 (10th Cir. 1944); United States v. Armour & Co., 137 F.2d 269 (10th Cir. 1943); 8 Moore's Federal Practice ¶ 7.04 at 7–14 to 7–20.

and engaging in a continuing conspiracy from 1959 to 1965,[6] but the indictment specifically stated that Wilshire only participated from December 31, 1960, until August 9, 1963,[7] Rather than a devious attempt to conceal vital elements of a defect-free indictment, this was an adequate attempt to further vouchsafe Wilshire's constitutional rights. The record vividly reflects that appellant was made cognizant of the charge and facts constituting the breach of law;[8] was able to plead, prepare a defense and produce witnesses to meet the charge. The practical effect was that the protection to be afforded by the indictment was furnished.

■ The brunt of the sufficiency of evidence argument focuses on the propriety of attributing the previously obtained guilty knowledge of a Riffe Division agent, to Wilshire after the merger. At this juncture Jones v. United States, 251 F.2d 288, 293 (10th Cir. 1958) is material. In that opinion we said: "A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party, and with that knowledge commits some act in furtherance thereof. [citing cases] This knowledge and participation may be inferred from the circumstances, acts and conduct of the parties." The agent caught in the crossfire of this argument was first employed by Riffe in early 1960, to represent its asphalt interests in Kansas and Colorado. Riffe was the broker for asphalt produced at the Century Refining Company at Shallow Water, Kansas, and it was the agent's responsibility to procure contracts with the state and local governments of Kansas. In 1960, the Riffe Company won only nine "points" in a single western Kansas division in the counties around Shallow Water. In 1961 the Wilshire agent attended the conspirator's meeting, and was able to win forty-two western Kansas "points." Wilshire argues that the only knowledge it could have had regarding their participation in the conspiracy was knowledge acquired prior to the merger and they are thereby liable for neither the pre-merger crime nor their post-merger involvement. The first argument is wide of the mark since the prosecution of Wilshire extends only from late 1960 to August, 1963. The latter statement is novel in that it ignores facts and circumstances which permit the court and jury to imply ratification or acquiescence. We pause to note that the argument does not deny that an agent's knowledge is imputed to the corporation if gained

6. Paragraph 12 reads: "Beginning some time prior to 1959 and continuing thereafter through at least 1965, the exact dates being to the grand jurors unknown, the defendants and co-conspirators entered into and engaged in a combination and conspiracy in unreasonable restraint of the hereinbefore described interstate trade and commerce in liquid asphalt in violation of Section 1 of * * * the Sherman Act."

7. Paragraph 3 reads: "Wilshire Oil Company of Texas * * * a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Denver, Colorado, is hereby indicted and made a defendant herein. Riffe Petroleum Company, a corporation organized and existing under the laws of the State of Oklahoma, was purchased by and merged with Wilshire Oil on or about December 31, 1960. From about December 31, 1960 until August 9, 1963, Riffe Petroleum Company was operated by Wilshire Oil as an unincorporated division of Wilshire Oil. From about December 31, 1960 until August 9, 1963, Wilshire Oil, through its Riffe Petroleum Division, engaged in the business of distributing and selling liquid asphalt in the State of Kansas and in other States."

8. Wilshire's pre-trial motion to dismiss is further evidence that it was well informed by the indictment of the charge lodged against the company. That motion implicitly acknowledges that they were charged with joining and participating in an on-going conspiracy, and read in part: "The indictment is fatally defective * * * in that: a. It does not allege that this defendant knew of the existence of the conspiracy, agreed to become part of it, and with that knowledge committed some act in furtherance thereof, required in this case because of other allegations in the indictment."

while acting in the scope of employment. The proposition merely suggests that Wilshire is immune from prosecution here because of a fortuitous series of events which placed them at the scene after the acquisition of the agent's information.

There is no question about the continuing nature of the plot nor is there reasonable doubt that Wilshire was a part thereof. And we believe the ticklish problem of pre-merger knowledge must be decided against Wilshire on the facts. Although appellant claims to have unwittingly bought into an ongoing conspiracy and for that reason it ought to be excused, the totality of the evidence supports the conclusion that Wilshire had ample opportunity to detect and reject the illegal practices. This is not a case where a company was purchased without chance for scrutinizing observation prior to assumption of control. The agreement of merger is dated September 23, 1960. This ought to have given appellant adequate time to become intimately familiar with the modus operandi of Riffe. And undisputed evidence was tendered by the Kansas salesman of Riffe Division from which it may be concluded that during the three year affiliation of Riffe with Wilshire, the vice-president in charge of the Riffe Division knew of and acquiesced in the continued conspiratorial participation. Wilshire is unable to rid itself of liability because of its inability to personally supervise the acquired company and its subordinates particularly when they failed to object a single time during the three year association. Viewed in the light most favorable to the Government, the evidence tendered by the prosecution provided ample basis for a jury, properly instructed, to find the requisite knowledge and participation by Wilshire.

█ Appellant next contends that the indictment and evidence are insuffi-

cient by their failure to set out factual allegations and proof of a conspiracy in restraint of interstate trade. It has long been settled that "[a]greements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition." Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 626, 84 L.Ed. 852 (1940). To sufficiently allege the interstate nature of the offense, the indictment need only charge that a combination was formed to fix prices on goods traveling interstate and that it had that effect or contributed to that end.[9] The indictment alleged that "[s]ubstantial quantities of liquid asphalt purchased by the State of Kansas and transported into Kansas in a continuous and uninterrupted flow of interstate commerce directly from the refinery of the American Oil Company which is located at Sugar Creek, Missouri, to job sites in Kansas." The purpose was "to fix, maintain, and establish non-competitive prices for the sale of liquid asphalt to the state of Kansas." And the effect was that "prices of liquid asphalt to the State of Kansas have been fixed, maintained, and established at high, artificial, and non-competitive levels." Hence, the substance of the statutory offense is charged as are the facts supporting the offense and the indictment is sufficient.

█ The evidence is not insufficient merely because Wilshire itself was not shown to have shipped into Kansas. The apposite inquiry is whether appellant was engaged in a plot which maintained prices on products, a part of which, moved in interstate trade.[10] The evidence is undisputed that Standard Oil shipped asphalt into Kansas. It is not contested that Standard won numerous "points" in northeast Kansas as a result of the conspiracy nor is it denied that

---

9. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Pevely Dairy Co. v. United States, 178 F.2d 363 (8th Cir. 1949).

10. United States v. Painters' Dist. Council No. 14, etc., 44 F.2d 58 (N.D.Ill. 1930); Boyle v. United States, 40 F.2d 49 (7th Cir. 1930).

the interstate goods went to those "points." None of the agents deny that Standard was an active participant in the scheme, nor does the Standard salesman. Furthermore, contrary to Wilshire's argument, all oil company representatives agreed that there was one Kansas conspiracy which dealt with all the highway districts. A careful review of the testimony and exhibits reflects abundant evidence from which the jury could properly find the existence of one conspiracy which included Wilshire in western Kansas and Standard Oil in eastern Kansas.

■ The next point urged by Wilshire is that the court erred in overruling their motion for a new trial based on the jurors' reading of a newspaper headline. Near the close of the trial several prejudicial newspaper articles were called to the court's attention. Following the practice commenced in Mares v. United States, 383 F.2d 805 (10th Cir. 1967), each juror was separately examined by the court. The trial court determined that three jurors saw part of a headline but that each heeded the admonition of the court and desisted from reading the story. The headline read: "Attempt Made At Oil Accord— Kansas Highway Board Meets With Counsel for Firms—No Commitments Yet—Talks Explore Possibility of Antitrust Settlement." Although there is no mention of Wilshire in the headline, appellant argues that prejudicial conclusions are the natural result of having viewed the caption. Ultimate reliance is placed on Mares v. United States, supra, and Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), which, as the trial court noted, do not govern the instant situation. In Mares the story and headlines reported prior confessions of the defendant for the very crime for which he was then being tried. In Marshall the newspaper exposed evidence which had previously been ruled inadmissible at trial. The in-

stant headlines and story do not approach such prejudicial comment. The trial judge found no reason to infer prejudicial conclusions from the jurors' brief encounter and neither can we. Welch v. United States, 371 F.2d 287 (10th Cir. 1966). We find neither error nor abuse of discretion in the trial court's manner of handling the problematical issue.

■ On the proposition that Wilshire and others were convicted in a federal court for participation in an asphalt conspiracy in Missouri, it is contended that the prosecution here twice places Wilshire in jeopardy. Appellant's basic plea is that the government is attempting to splinter a single conspiracy into two parts, i.e., a Missouri conspiracy and a Kansas conspiracy, when in fact and law the two are but fragments of a single scheme. The indictments in Kansas and Missouri are in some respects identical, with the following relevant exceptions. (1) Different parties are named in each: there are eight corporations common to both; two were named in Kansas and not in Missouri; ten corporate and seventeen individual defendants were named in Missouri and not in Kansas. (2) There are overlapping but different dates of existence: in Missouri it was from 1960–63 and in Kansas from 1959–65. (3) The offenses charged vary: the Missouri indictment charged that the defendants and co-conspirators acted to "suppress and eliminate competition in the sale of liquid asphalt to the State of Missouri * * *"; the Kansas indictment charged the co-conspirators and defendants with conspiring "to fix, maintain, and establish non-competitive prices for the sale of liquid asphalt to the State of Kansas * * *." Although a single plot may not be severed into several in order to proliferate penalties, prosecution for one offense will not confer immunity from subsequent prosecutions of distinct, though related, offenses.[11]

11. Hattaway v. United States, 399 F.2d 431 (5th Cir. 1968); Nelms v. United States, 291 F.2d 390 (4th Cir. 1961); United States v. Cohen, 197 F.2d 26 (3d

Thus the pertinent inquiry is whether the record presented by Wilshire is sufficient to establish that it and all other oil companies indicted in Missouri and Kansas had a single, common and continuing objective of fixing, maintaining and establishing prices to suppress and eliminate competition in the sale of liquid asphalt to Kansas and Missouri.[12] If so, there would be but one conspiracy even though its purposes were advanced in diverse states by diverse parties. Contrariwise, if the Missouri defendants did not share such broad objectives with their Kansas counterparts, but were attempting only to fix prices within their respective states, there were multiple conspiracies with each pursuing its own distinct illegal end.

■ Because the resolution of the question depends on the facts of each case, we are hesitant to follow other decisions unless they are on all fours with this suit. Appellant urges that the Honda cases[13] and United States v. H. E. Koontz Creamery, Inc., 257 F.Supp. 295 (D.Md.1966) are such cases. After careful examination of the facts in each, we are unable to concur with Wilshire's analogy. In each of these cases the courts were dealing with facts which do not coalesce with Wilshire's.

In Koontz, the defendants were milk distributors who had been earlier convicted for fixing prices on school milk in the Baltimore area. They were then indicted for fixing other wholesale and retail milk prices during the same period of time in the same area. The trial court granted their motion to dismiss on double jeopardy grounds on the following facts. The defendants in both cases were substantially identical; they met or were represented at meetings at the same principal place under the auspices of the Milk Distributors Association; the meetings were called and conducted the same whether the purpose was school bids, labor costs, the price of raw milk, jugs, jug pricing and deposits, or other matters of interest; at the meetings the subject matter usually covered numerous topics relating to the overall price control scheme. The court concluded: "The purpose of the defendants, conspiratorial or not, was to maintain market price stability in the Baltimore milk market. * * * and that actions with respect to school milk, street milk, and jug milk were actions designed to control certain aspects of distribution, all of which were facets of, or factors in, the overall price structure." United States v. Koontz Creamery, Inc., 257 F. Supp. at 305.

In the Honda cases, American Honda was first tried and convicted for fixing prices on Honda motorcycles in the Los Angeles area. Thereafter indictments were returned against them in northern California, northern Illinois and southern Ohio for identical offenses. In each of the latter cases Honda moved for dismissal on double jeopardy grounds, which were granted. The persuasive evidence in those cases was as follows: Honda dealers in each area are concerned with the retail price structure in all other areas; price-cutting affects the ability of dealers to maintain proper servicing and advertising and in turn the

Cir. 1952); Upshaw v. United States, 157 F.2d 716 (10th Cir. 1946); United States v. American Honda Motor Co., 273 F.Supp. 810 (N.D.Ill.1967); United States v. American Honda Motor Co., 271 F.Supp. 979 (N.D.Cal.1967).

12. The burden of proving former jeopardy for the same offense by a preponderance of the evidence rests upon the movants: Sanchez v. United States, 341 F.2d 225 (9th Cir. 1965); Rothaus v. United States, 319 F.2d 528 (5th Cir. 1963); Reid v. United States, 177 F.2d 743 (5th

Cir. 1949); United States v. Potash, 118 F.2d 54 (2d Cir. 1941); United States v. American Oil Co., 296 F.Supp. 538 (D.N.J.1969); United States v. H. E. Koontz Creamery, Inc., 257 F.Supp. 295 (D.Md.1966).

13. United States v. American Honda Motor Co., 289 F.Supp. 277 (S.D.Ohio 1968); United States v. American Honda Motor Co., 273 F.Supp. 810 (N.D.Ill.1967); United States v. American Honda Motor Co., 271 F.Supp. 979 (N.D.Cal.1967).

product's reputation is injured; all dealers are concerned about discounting in one area because of the tendency of others to follow suit; the widespread price stability is a strong inducement to prospective dealers; and discounting in any area affects trade-in value as compiled for the trade Blue Book. The courts said: "It is unrealistic to conclude that dealers in one region were wholly unconcerned with the maintenance of prices in other regions and concerned only with price maintenance by dealers in their own particular region." United States v. American Honda Motor Company, 271 F.Supp. at 985 and United States v. American Honda Motor Co., 273 F.Supp. at 818.

Wilshire was given opportunity in an independent evidentiary hearing to develop facts to support its double jeopardy claim. But the testimony proffered then simply does not compare favorably to the above cases. Because the Missouri defendants plead nolo contendere, we have no testimony to examine and compare to that offered in the Kansas trial. We are thus compelled to rely exclusively upon the evidence tendered in the post-trial hearing on the double jeopardy claim. Wilshire's Kansas agent testified first. In highly synthesized form, he repeatedly affirmed that although he knew of the Missouri conspiracy and participated in the one in Kansas, he knew of no connecting link between the two. To his knowledge there was never any discussion relative to the Missouri bidding, during the course of the Kansas meetings; Wilshire never discussed with the competitors the restriction of Kansas bidding in anticipation of more Missouri contracts; and he knew of no attempt by any of the companies to take less in one state to gain in the other. Next the Missouri salesman of the Riffe Division of Wilshire volunteered that there was never any connection between their bids in Missouri and Kansas. Finally a Skelly salesman reaffirmed that he knew of no Kansas meetings where the Missouri lettings were discussed nor any Missouri meetings where Kansas bids were talked about. He added that neither his company nor any of the others restricted their bids in one state to secure additional "points" in another state. He concluded by answering that there was never any statement made to him that there was any connection between the bids in the two states. And on cross-examination he further elaborated that there was never a meeting where they talked about one state and then switched to the other. At the conclusion of the evidentiary hearing, the trial judge entered findings which, coupled with the testimony, refute any favorable comparison of this case to the Koontz or Honda cases.[14] In short, there is a general absence of testimonial evidence which supports appellant's double jeopardy claim. Our conclusion is but an echo of the trial judge's that the parties here were tried for a plot involving a distinctively separate conspiratorial purpose.

 It is also urged that counsel for the Government was guilty of making inflammatory remarks sufficient to

---

14. The trial judge found: " * * * that the government has established beyond a reasonable doubt that there was not one large conspiracy split into small ones * * *. The sole subject of the Kansas conspiracy was to allocate points or by allocating points, fix the prices of liquid asphalt sold to the State of Kansas, and the purpose of the Missouri conspiracy was identical except that it had to do with the sale of liquid asphalt to the State of Missouri.

I find that the conspiracies charged * * * were completely different and unconnected although necessarily, as the evidence progressed, there was some reference back and forth to the dealings between the defendant here and the other defendants in the case, and the State of Missouri.

I find that the proof of the matters charged in the Kansas indictment would not have been admissible had there been a trial on the Missouri indictment and that if admitted, it would not have sustained a conviction on the Missouri indictment."

entitle Wilshire to reversal. The remarks were improper[15] but even if they were prejudicial their impact was promptly removed by the trial court's instruction to the jury. The determination of the extent of permissible argument rests primarily in the discretion of the trial court. We do not agree that remarks made by counsel were of such gravity as to require reversal in view of the timely admonition of the lower court.[16]

■ The trial court imposed a fine of $25,000 on Wilshire. The maximum fine allowed by 15 U.S.C.A. § 1 is $50,000. Appellant says the fine was excessive. We have often held that when the punishment is within the statutory limit, this court will not interfere with the trial court's exercise of discretion in fixing the punishment absent unusual circumstances,[17] none of which are present here.

Affirmed.

15. The lawyer said: "Mr. Woolsey [defendant's attorney] has attempted * * * to confuse the issue, throw sand in your eyes * * *."

16. Bailey v. United States, 410 F.2d 1209 (10th Cir. 1969); Aiuppa v. United States, 393 F.2d 597 (10th Cir. 1968), vacated on other grounds, Giordono v. United States, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969).

17. See Weissman v. United States, 387 F.2d 271 (10th Cir. 1967); Welch v. United States, 371 F.2d 287 (10th Cir. 1966); Martin v. United States, 364 F.2d 894 (10th Cir. 1966).